## JOANNE MENDILLO ET AL. *v.* BOARD OF EDUCATION OF THE TOWN OF EAST HADDAM ET AL.
## (SC 15757)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.[1]

---

[1] This appeal was originally argued before a panel of this court consisting of Chief Justice Callahan, and Justices Borden, Berdon, Palmer and McDonald. Thereafter, the court decided, pursuant to Practice Book § 4112, now Practice Book (1998 Rev.) § 70-7 (b), to consider the case en banc. Justices Norcott and Katz were added to the panel, and the court heard additional oral argument on the following question: "Whether the trial court was correct in striking the counts of the complaint alleging that the minor children 'have lost the consortium of their mother [the plaintiff].' "

Argued April 22—officially released August 25, 1998

*Lori Welch-Rubin*, for the appellants (plaintiffs).

*Edward Maum Sheehy*, with whom was *Suzannah K. Nigro*, for the appellees (defendants).

*William F. Gallagher* and *Kurt D. Koehler* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Jack G. Steigelfest* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Opinion*

BORDEN, J. The principal issues in this appeal are whether: (1) the named plaintiff, a high school principal who claims to have been wrongfully "constructively discharged" by the defendant board of education, was required to exhaust her administrative remedies under General Statutes (Rev. to 1991) § 10-151 (d),[2] which is

---

[2] General Statutes (Rev. to 1991) § 10-151 (d) provides: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons: (1) Inefficiency or incompetence; (2) insubordination against reasonable rules of the board of education; (3)

moral misconduct; (4) disability, as shown by competent medical evidence; (5) elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which such teacher may be appointed if qualified, provided such teacher, if qualified, shall be appointed to a position held by a teacher who has not attained tenure, and provided further that determination of the individual contract or contracts of employment to be terminated shall be made in accordance with either (A) a provision for a layoff procedure agreed upon by the board of education and the exclusive employees' representative organization or (B) in the absence of such agreement, a written policy of the board of education; or (6) other due and sufficient cause. Nothing in this section or in any other section of the general statutes or of any special act shall preclude a board of education from making an agreement with an exclusive bargaining representative which contains a recall provision. Prior to terminating a contract, a board of education shall vote to give the teacher concerned a written notice that termination of such teacher's contract is under consideration and, upon written request filed by such teacher with such board within seven days after receipt of such notice, shall within the next succeeding seven days give such teacher a statement in writing of the reasons therefor. Within twenty days after receipt of written notice by the board of education that contract termination is under consideration, such teacher may file with such board a written request for a hearing. A board of education may designate a subcommittee of three or more board members to conduct hearings and submit written findings and recommendations to the board for final disposition in the case of teachers whose contracts are terminated for the reasons stated in subdivision (5) of this subsection. Such hearing shall commence within fifteen days after receipt of such request, unless the parties mutually agree to an extension, (A) before the board of education or a subcommittee of the board, (B) if indicated in such request or if designated by the board before an impartial hearing panel or, (C) if the parties mutually agree, before a single impartial hearing officer chosen by both parties. If the parties are unable to agree upon the choice of a hearing officer within five days after their decision to use a hearing officer, the hearing shall be held before the board or panel, as the case may be. The impartial hearing panel shall consist of three members appointed as follows: The board of education shall appoint one panel member, the teacher shall appoint one panel member, and those two panel members shall choose a third, who shall serve as chairperson. Within ninety days after receipt of the request for a hearing, the impartial hearing panel, subcommittee of the board or hearing officer, unless the parties mutually agree to an extension, shall submit written findings and a recommendation to the board of education as to the disposition of the charges against the teacher, and shall send a copy of such findings and recommendation to the teacher. The board of education shall give the teacher concerned its written decision within fifteen days of receipt of the written recommendation of the impartial hearing panel, subcommittee or hearing officer. Each party shall pay the fee of the

part of the Teacher Tenure Act (act), before bringing this plenary action for damages; and (2) we should recognize a derivative cause of action for loss of parental consortium by a minor child. The named plaintiff, Joanne Mendillo, her husband, John Mendillo, and her minor children, Sean and Sara Mendillo[3] appeal[4] from the judgment of the trial court dismissing for lack of subject matter jurisdiction the plaintiff's various substantive claims against the defendants, the East Haddam

panel member selected by it and shall share equally the fee of the third panel member or hearing officer and all other costs incidental to the hearing. If the hearing is before the board of education, the board shall render its decision within fifteen days after the close of such hearing, and shall send a copy of its decision to the teacher. The hearing shall be public if the teacher so requests or the board, panel or subcommittee so designates. The teacher concerned shall have the right to appear with counsel at the hearing, whether public or private. A copy of a transcript of the proceedings of the hearing shall be furnished by the board of education, upon written request by the teacher within fifteen days after the board's decision, provided the teacher shall assume the cost of any such copy. Nothing herein contained shall deprive a board of education of the power to suspend a teacher from duty immediately when serious misconduct is charged without prejudice to the rights of the teacher as otherwise provided in this section."

Hereafter, unless otherwise indicated, all references in this opinion are to the 1991 revision of § 10-151 (d).

[3] Because much of our discussion involves only the named plaintiff's substantive claims for wrongful discharge and other torts, and her husband's derivative claims for spousal consortium related to those torts, hereafter we refer to her individually as the plaintiff and to them collectively as the plaintiffs. We refer to their children as the minor plaintiffs because their claims concern only their derivative claims for loss of parental consortium.

We note, however, that the minor plaintiffs purport to sue in their own names, rather than by way of claims on their behalf by a parent or next friend. Neither they nor the plaintiff seek to explain why they are not governed by the general rule that minor children may only sue by way of a parent or next friend. *Cottrell* v. *Connecticut Bank & Trust Co.*, 175 Conn. 257, 264, 398 A.2d 307 (1978); *Collins* v. *York*, 159 Conn. 150, 153, 267 A.2d 668 (1970). Because this question was not raised in the trial court or this court, however, we decide the validity of their derivative claims on the basis on which it was litigated in the trial court and argued in this court. *Petco Insulation Co.* v. *Crystal*, 231 Conn. 315, 320 n.9, 649 A.2d 790 (1994); *McLaughlin* v. *Bronson*, 206 Conn. 267, 276, 537 A.2d 1004 (1988).

[4] The plaintiffs and the minor plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this

board of education (board of education) and Daniel J. Thompson, the superintendent of schools for the East Haddam school district, and striking the derivative claims of the minor plaintiffs for loss of parental consortium. The plaintiffs claim that the trial court had subject matter jurisdiction over the plaintiff's substantive claims, and that we should recognize a derivative cause of action for loss of parental consortium by a minor child. We conclude that the trial court had subject matter jurisdiction over the plaintiff's substantive claims. We decline, however, to recognize a derivative cause of action for loss of parental consortium by a minor child. Accordingly, we reverse the judgment in part and affirm it in part.

In the original twelve count complaint,[5] the plaintiff alleged four substantive counts against the defendants: (1) wrongful constructive discharge; (2) defamation; (3) invasion of privacy by false light; and (4) intentional infliction of emotional distress. The plaintiff's husband alleged four corresponding derivative claims for loss of spousal consortium, and the minor plaintiffs alleged four corresponding derivative claims for loss of parental consortium. The trial court, *Gaffney, J.*, granted the defendants' motion to strike the minor plaintiffs' four counts for loss of parental consortium.

Thereafter, the plaintiffs filed a substitute complaint reasserting the eight counts still in contention, namely, the four substantive counts by the plaintiff alleging

court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

[5] Although the original complaint contained eighteen counts, the plaintiff subsequently withdrew her second substantive count, and the two derivative consortium counts that relied on that withdrawn count subsequently were stricken by agreement. In addition, the plaintiff's sixth substantive count was stricken by agreement, and the two derivative consortium counts that relied on that stricken count also were stricken by agreement, leaving twelve counts in contention. We therefore refer to the original complaint as containing twelve counts.

wrongful constructive discharge, defamation, invasion of privacy by false light, and intentional infliction of emotional distress, and the four derivative counts by her husband alleging loss of spousal consortium as to each count alleged by the plaintiff. The defendants answered the complaint, denying its essential allegations, and filed the following special defenses: (1) the plaintiff, by a letter dated October 31, 1991, had resigned as principal of the high school effective November 4, 1991; and (2) if the plaintiff had been constructively discharged, which they denied, the court lacked jurisdiction over her claim because she had failed to exhaust her administrative remedies under § 10-151 (d), and had failed to exhaust the grievance and arbitration procedures available to her under a certain collective bargaining agreement. The plaintiff replied that her resignation did not provide a legally cognizable defense to her complaint because she had been forced to resign by the hostile environment created by the defendants, and that she was not required to exhaust the statutory or contractual administrative remedies asserted by the defendants.

The defendants moved to dismiss the entire substitute complaint for lack of subject matter jurisdiction, on the grounds that: (1) the plaintiff had failed to exhaust her administrative remedies under § 10-151 (d); (2) the plaintiff had failed to exhaust the grievance and arbitration procedures of an agreement between the board of education and the East Haddam Administrators' Association, of which the plaintiff had been a member (agreement); and (3) the claims for loss of consortium were merely derivative of the plaintiff's substantive claims. In connection with this motion to dismiss, the defendants filed an affidavit of Thompson, together with a copy of the agreement and excerpts

from the plaintiff's deposition.[6] In response, the plaintiffs filed their affidavits,[7] along with excerpts from the deposition of Carl Viggiani, a former member of the board of education.[8] The trial court, *Stengel, J.*, considered the motion on the papers presented to it, without taking further evidence, and granted the motion to dismiss. As to the wrongful constructive discharge count, the court agreed with the defendants' contention that

---

[6] In his affidavit, Thompson referred to the pertinent sections of the agreement, a copy of which he attached to the affidavit. In addition, he asserted that the plaintiff had never filed a grievance under the agreement, that the board of education had renewed her contract in March, 1991, and that she had resigned as principal of the high school on November 4, 1991, as evidenced by her letter of resignation, a copy of which he attached. He also denied the allegations of the plaintiff's complaint, which formed the basis of her claims of defamation and invasion of privacy, that he had disseminated his written evaluations of her in the summer of 1991 and the winter of 1992.

In addition, the defendants submitted excerpts from the plaintiff's deposition. In the excerpted portions of that deposition, the plaintiff testified that, in 1991, when Thompson had issued his written evaluation of her, the contractual grievance procedure was in place to challenge the evaluation but that, for various reasons, she had not invoked it.

[7] In her affidavit, the plaintiff asserted that many of the alleged "harassing events" that resulted in her "forced resignation" in November, 1991, occurred after the board of education had renewed her contract in March, 1991. She also offered an explanation of why she believed that it would have been futile to resort to the grievance and arbitration procedures of the agreement. In addition, she repeated many of the allegations of her complaint concerning the alleged deprivation of her rights under § 10-151. Finally, she specifically controverted Thompson's statements in his affidavit that he had not disseminated his written evaluation of her during the summer of 1991 and the winter of 1992, and she asserted that an end of the year written evaluation of an administrator was not grievable under the agreement.

In his affidavit, the plaintiff's husband asserted that, as a former field representative of the Connecticut Education Association, he was familiar with the requirements of the act. On the basis of that familiarity, he corroborated the plaintiff's assertions regarding the alleged deprivation of her rights under the act, and her assertion that an end of the year evaluation of an administrator is not grievable under the agreement.

[8] The gist of much of Viggiani's deposition was that in his opinion, the plaintiff had been mistreated by Thompson and the board of education, and that certain of the members of the board had exhibited a hostile attitude toward the plaintiff.

the plaintiff was required to exhaust her administrative remedies under § 10-151 (d) and the grievance and arbitration procedures of the agreement. As to the counts alleging defamation, invasion of privacy by false light and intentional infliction of emotional distress, the court agreed with the defendants' contention that the plaintiff was required to exhaust the grievance and arbitration procedures because her claims arose out of circumstances covered by the agreement. Accordingly, the court dismissed the substitute complaint for lack of subject matter jurisdiction. This appeal followed.

I

WRONGFUL CONSTRUCTIVE DISCHARGE

We first address the plaintiff's contention that the trial court had subject matter jurisdiction over her wrongful constructive discharge claim because under the circumstances of this case, she was not required to exhaust the administrative procedures of § 10-151 (d) or the grievance procedures of the agreement before asserting that claim. The plaintiff agrees that in the absence of an applicable exception to the exhaustion doctrine, the failure by a tenured teacher to invoke the administrative procedures of § 10-151 (d) deprives the court of jurisdiction over a claim of wrongful termination. *School Administrators Assn.* v. *Dow*, 200 Conn. 376, 384–85, 511 A.2d 1012 (1986); *LaCroix* v. *Board of Education*, 199 Conn. 70, 83–84, 505 A.2d 1233 (1986). The plaintiff argues, however, that a claim of constructive discharge comes within the exception to the exhaustion doctrine for cases in which recourse to the administrative remedy would be futile or inadequate. We conclude that the plaintiff's claim of constructive discharge, as alleged in her substitute complaint, falls within that exception to the exhaustion doctrine.

We note first that in deciding the defendants' motion to dismiss, the trial court did not purport to resolve what

factual discrepancies there may have been between, on the one hand, the factual assertions of Thompson, including his presentation of the agreement and the plaintiff's resignation letter of November 4, 1991, in support of the motion and, on the other hand, the factual assertions of the plaintiffs and Viggiani, in opposition to the motion. Thus, we review that decision on the basis on which it was rendered, namely, that for purposes of the motion, the allegations of the complaint were taken as true and were supplemented by the undisputed documents, namely, the agreement and the plaintiff's letter of resignation.[9] We therefore turn to the factual allegations, which we assume to be true, that underlie the plaintiff's claim of wrongful constructive discharge.

The plaintiff alleged that Thompson became the superintendent of schools for the East Haddam school district on January 2, 1991, and at all relevant times he acted as the agent of the board of education. The plaintiff also alleged that since January, 1969, she had been a teacher, as defined in General Statutes (Rev. to 1991) § 10-151 (a) (2),[10] employed by the board of education and, from August 1, 1985, to November 4, 1991, she was the principal of the Nathan Hale-Ray High School in the East Haddam school district.

The plaintiff alleged further that on various dates between January 4, 1991, and November 4, 1991, Thompson "engaged in a deliberate effort to harass and torment the plaintiff . . . making her continued

---

[9] The plaintiff's letter of resignation is "undisputed" only in the sense that she admits that she signed and submitted it. By her claim of constructive discharge, however, she does dispute its legal effect.

[10] General Statutes (Rev. to 1991) § 10-151 (a) provides in relevant part: "(2) The term 'teacher' shall include each certified professional employee below the rank of superintendent employed by a board of education in a position requiring a certificate issued by the state board of education . . . ."

employment with the East Haddam school district, for all practical purposes, impossible."[11] The plaintiff also alleged that as a result of this course of conduct, she was "constructively discharged" on November 4, 1991. She also alleged that she lost expected accumulated sick pay that she would have been paid had she remained employed by the board of education until retirement, and that she was forced to seek employment as a high school principal in another school district that was a long distance from her home in East Haddam, requiring her to maintain a separate residence at great personal expense and depriving her of the companionship of her husband and children during the school week. Finally, she alleged that as a further result of the defendants' actions, she "suffered severe emotional distress, mental anguish and pain, resulting in illness" and causing her to incur medical expenses.

"The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. *Connecticut Life & Health Ins. Guaranty Assn.*

---

[11] According to the plaintiff's allegations, this effort by Thompson to harass her consisted of: a threat to the plaintiff that her filing of an unfair labor practice complaint against the board of education " 'will cost you' "; verbal harassment by demanding to know whether she had " 'cheated on the mastery test results,' " and by stating that the state department of education should not have granted her school compliance; screaming at her for supporting the continued psychiatric placement of a suicidal student because it was too expensive for the town; verbally attacking the plaintiff at a budget meeting by calling her a " 'liar' " and " 'incompetent,' " and accusing her of " 'hiding in the shadows of' " Thompson's deceased predecessor as superintendent, with whom the plaintiff had had a close working relationship; informing her at a private meeting that he believed that she was " 'learning disabled,' " that she had " 'weak communication skills' " and was " 'inarticulate,' " that " 'people conclude that [she] is a liar because [her] eyes get big when [she] talk[s],' " and that it " 'would be a good idea' " if she resigned; and, despite the fact that she had always received positive evaluations, submitting in June, 1991, a " 'misleading and inaccurate' " written evaluation of her, portraying her as " 'substandard.' "

v. *Jackson*, [173 Conn. 352, 358–59, 377 A.2d 1099 (1977)]. The doctrine of exhaustion furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency . . . in advance of possible judicial review. *Watergate II Apartments* v. *Buffalo Sewer Authority*, 46 N.Y.2d 52, 57, 385 N.E.2d 560, 412 N.Y.S.2d 821 (1978)." (Internal quotation marks omitted.) *Concerned Citizens of Sterling* v. *Sterling*, 204 Conn. 551, 557, 529 A.2d 666 (1987).

"Despite the important public policy considerations underlying the exhaustion requirement, we have grudgingly carved several exceptions from the exhaustion doctrine. *Cahill* v. *Board of Education*, 198 Conn. 229, 241, 502 A.2d 410 (1985). We have recognized such exceptions, however, only infrequently and only for narrowly defined purposes. *LaCroix* v. *Board of Education*, [supra, 199 Conn. 79]; see also *Polymer Resources, Ltd.* v. *Keeney*, 227 Conn. 545, 561, 630 A.2d 1304 (1993). One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile or inadequate. *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 429, 655 A.2d 1121 (1995); *Labbe* v. *Pension Commission*, [229 Conn. 801, 814, 643 A.2d 1268 (1994)]." (Internal quotation marks omitted.) *Hunt* v. *Prior*, 236 Conn. 421, 432, 673 A.2d 514 (1996). "An administrative remedy is futile or inadequate if the agency is without the authority to grant the requested relief." *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 628, 577 A.2d 1017 (1990). This exception applies to the facts of the present case because the issues in controversy between the plaintiff and the defendants are not the issues contemplated by a termination hearing held pursuant to § 10-151 (d).

As the pleadings indicate, the plaintiff claims that, although in form she submitted a letter of resignation, in substance she was forced to submit that letter by

Thompson's intentionally harassing and tormenting course of conduct toward her. This is the essence of her claim of constructive discharge. The defendants dispute, however, that there ever was such a course of conduct by Thompson and rely, instead, on the fact of her letter of resignation. Thus, the defendants dispute that her employment was terminated by them at all. In essence, they claim that she resigned. This simply is not the kind of dispute that a termination hearing pursuant to § 10-151 (d) is designed to resolve.

The reciprocal purposes of the provisions of § 10-151 (d); see footnote 2 of this opinion; are (1) to provide both a substantive and procedural framework within which a board of education may terminate a teacher's contract notwithstanding the teacher's tenured status, and (2) to protect the teacher's right to due process of law. See *LaCroix* v. *Board of Education*, supra, 199 Conn. 85–86. Under § 10-151 (d), there are six potential grounds for termination of the contract of a tenured teacher: (1) inefficiency or incompetence; (2) insubordination; (3) moral misconduct; (4) medical disability; (5) elimination of the teacher's position; and (6) "other due and sufficient cause." If termination of a teacher's contract is contemplated, the superintendent must first give the teacher written notice "that termination of such teacher's contract is under consideration . . . ." General Statutes (Rev. to 1991) § 10-151 (d). If the teacher then makes a timely written request, the superintendent must give the teacher a timely "statement in writing of the reasons" for the proposed termination, which must fall within one or more of the six grounds for termination. General Statutes (Rev. to 1991) § 10-151 (d). The teacher may respond by making a timely request for a hearing before the board of education. General Statutes (Rev. to 1991) § 10-151 (d). The function of the hearing is, in general, to resolve the question of whether any of the asserted grounds for termination is supported

by the evidence adduced at the hearing. See, e.g., *Catino v. Board of Education*, 174 Conn. 414, 417–18, 389 A.2d 754 (1978). At that hearing, moreover, the burden of proof is on the superintendent. *Tucker* v. *Norfolk Board of Education*, 177 Conn. 572, 576, 418 A.2d 933 (1979); *Zanavich* v. *Board of Education*, 8 Conn. App. 508, 510, 513 A.2d 196, cert. denied, 201 Conn. 809, 515 A.2d 381 (1986).

To require the plaintiff, under the facts of the present case, to invoke the provisions of § 10-151 (d) would be to attempt to force the proverbial square peg into a round hole. The dispute between the parties is not whether the plaintiff has engaged in any of the six potential grounds for termination. The defendants do not claim that she has. The dispute is whether she resigned voluntarily or was forced to do so by the wrongful conduct of Thompson. That kind of factual dispute simply does not fit within either the purpose or the language of § 10-151 (d). The board of education would not have been empowered, under § 10-151 (d), to determine whether a constructive discharge took place because that question is not one of the statutorily defined subjects of a hearing under the statute. Recourse to the administrative remedy of § 10-151 (d) would, therefore, be futile because the board of education would have been without the authority to grant the relief requested by the plaintiff. *Cannata* v. *Dept. of Environmental Protection*, supra, 215 Conn. 628.

This conclusion is buttressed by attempting to envision what would happen under the exhaustion scenario urged by the defendants. Under that scenario, although there had been no formal written notice of proposed termination as required by the statute, the defendants contend that such a notice was not necessary because the plaintiff, by her own allegations, already knew that she had been terminated. The defendants maintain that she then had the obligation to request a hearing before

the board of education. Presumably, that request would be for a hearing on the ground of the plaintiff's complaint, namely, that Thompson's intentionally harassing course of conduct toward her had forced her to submit her letter of resignation. Having alleged, however, that she had been in effect terminated by Thompson's conduct, she then presumably would have been confronted, not with a statement by Thompson that she had committed any of the six grounds for termination under § 10-151 (d), but with a statement that Thompson did not engage in any such conduct and that she in fact had resigned. Moreover, because she had alleged the facts constituting the constructive discharge, she presumably then would have had the burdens of production and persuasion on those allegations.

The hearing, therefore, as framed by her request and Thompson's reply, would have been to resolve the question of whether Thompson had constructively discharged her or she had resigned. It would not have involved whether any of the six statutory grounds for termination had been proven. Thus, the hearing before the board of education would have borne neither substantive nor procedural resemblance to the kind of hearing contemplated by § 10-151 (d).

In this respect, the present case is analogous, as the plaintiff argues, to what we characterized in *LaCroix* v. *Board of Education,* supra, 199 Conn. 81, as the board of education's "total default" of its obligations under General Statutes (Rev. to 1972) § 10-151 (b), which in that case excused a teacher's failure to follow the administrative remedies under the statute. In the present case, assuming the plaintiff's allegations to be true, the defendants, by engaging in an intentionally harassing course of conduct that forced the plaintiff to submit her letter of resignation, also would have totally defaulted in their obligations under § 10-151 (d). That is because by doing so the defendants would have wholly

deprived the plaintiff of the procedural due process protections of her constitutionally protected substantive right to her tenured teaching status. See *La Croix* v. *Board of Education*, supra, 80–81.

The same reasoning applies to the defendants' contention that the plaintiff also was required to exhaust the grievance and arbitration remedies provided by the agreement, because the agreement specifically links termination under the agreement to the provisions of the statute. Article one of the agreement provides that the board of education recognizes the East Haddam Administrators' Association "as the exclusive bargaining agent for those certified professional employees in the East Haddam School District who are employed in positions requiring an intermediate administrator or supervisory certificate, or the equivalent thereof, and who are not excluded" from the bargaining unit by certain statutory provisions. There is no dispute that the plaintiff was a member of the association and covered by the agreement. Article two, § 2.1.8 of the agreement provides that the board of education may "suspend or dismiss the administrators of the school *in the manner provided by statute* or ordinance . . . ."[12] (Emphasis added.) This can only mean that at least insofar as the agreement covers the procedures for dismissal or termination of the contract of a school principal, such a termination must be effected pursuant to the provisions of § 10-151 (d). Because, as we have just determined, there is no requirement that the plaintiff resort to the statutory administrative remedies provided by § 10-151 (d) before seeking judicial intervention, a contractual provision that simply refers to the same statutory scheme cannot be regarded as requiring resort to

[12] The defendants do not suggest that any ordinance of the town of East Haddam is relevant in this respect.

other remedies as preconditions to judicial intervention.[13] Therefore, by either route, the statute or the agreement, one arrives at the same destination.[14]

## II

### DEFAMATION AND INVASION OF PRIVACY BY FALSE LIGHT

The plaintiff claims that the trial court improperly dismissed her counts of defamation and invasion of privacy by false light, as alleged in her complaint, because one of the acts underlying those torts did not occur until after her employment by the board of education had terminated. Therefore, she argues, at that time she was no longer a member of the bargaining unit protected by the agreement, namely, administrative or supervisory employees of the school district, and could not have filed a grievance under the agreement. We agree.

In her defamation and invasion of privacy by false light counts, the plaintiff alleged that pursuant to General Statutes § 10-151c,[15] Thompson's false and misleading written evaluation of her could not be

---

[13] This conclusion renders it unnecessary to consider the plaintiff's argument that, as a matter of law, the statute provides the sole administrative framework for termination and, therefore, trumps any collective bargaining agreement that might also cover the question of termination.

[14] The same reasoning leads us to reject the defendants' claim that the judgment of the trial court should be affirmed on the alternate ground that, as a matter of substantive constructive discharge law, "all possible administrative remedies must be exhausted in order to maintain a claim of constructive discharge." The defendants argue, under this claim, that "there can be no constructive discharge because those administrative [remedies] represent[ed] a reasonable alternative to resignation." The remedies that the defendants proffer in support of this position, however, are the same statutory and contractual remedies discussed in the text, and they suffer from the same futility in this context as they do in the context of the exhaustion doctrine.

[15] General Statutes § 10-151c provides: "Records of teacher performance and evaluation not public records. Any records maintained or kept on file by any local or regional board of education which are records of teacher

disseminated publicly without her consent. She alleged further that Thompson improperly disseminated it twice: once, in the summer of 1991, to Robert Villanova of the Farmington school district; and again, in the winter of 1992, to Craig Ibbotsen, the plaintiff's successor as principal of the high school.[16] The plaintiff ceased her employment with the East Haddam school district on November 4, 1991, prior to the second alleged dissemination.

We agree with the plaintiff that at least to the extent that these counts rely on proof of improper dissemination of the written evaluation at a time when the plaintiff was no longer employed by the school district, she could no longer file a grievance based on that conduct by Thompson because she was no longer covered by the agreement.[17] Indeed, the defendants do not contend that she was then covered by the agreement.

They argue, instead, that the plaintiff has failed to exhaust her available contractual remedies insofar as she did not attempt to challenge the content of the written evaluation through the grievance procedure when, in 1991, Thompson wrote the evaluation. The

performance and evaluation shall not be deemed to be public records and shall not be subject to the provisions of section 1-19, provided that any teacher may consent in writing to the release of his records by a board of education. Such consent shall be required for each request for a release of such records. For the purposes of this section the term 'teacher' shall include each certified professional employee below the rank of superintendent employed by a board of education in a position requiring a certificate issued by the State Board of Education."

[16] Although Thompson denied these allegations of dissemination in his affidavit in support of the defendants' motion to dismiss, and the plaintiff reasserted the allegations in her affidavit in response thereto, the trial court did not resolve that factual dispute in the context of the motion.

[17] This does not mean, however, that termination of employment automatically precludes the filing of a grievance under all circumstances. For example, if the grievance is based on a claim of improper termination, the terminated employee could, and ordinarily would be required to, file a grievance.

defendants assert that the plaintiff, in her deposition testimony; see footnote 6 of this opinion; acknowledged that the grievance procedure was available in 1991 to challenge the evaluation. They argue that in light of the plaintiff's voluntary choice at that time not to pursue the available grievance procedure, the plaintiff should be prohibited from asking "the court to decide in the first instance the accuracy of the employment evaluation." We are not persuaded.

We note that despite this deposition testimony, the plaintiffs stated in their affidavits that written evaluations are not grievable matters. See footnote 7 of this opinion. It is not necessary for us to resolve this question, however.

First, in these two counts the plaintiff complains not only of what she characterizes as the false and misleading nature of the evaluation, but also of Thompson's improper dissemination of it. Second, at least one of those disseminations allegedly took place after her employment had terminated, removing her from the bargaining unit. In our view, the failure to file a grievance contesting the contents of an evaluation at its issuance does not destroy the right to challenge its unlawful dissemination after termination of employment. The doctrine of exhaustion of contractual remedies does not require such prescience. Therefore, even if we were to assume that the plaintiff could have contested the contents of her evaluation through the grievance procedure in 1991, her failure to do so does not deprive the trial court of jurisdiction over her defamation and invasion of privacy by false light claims.

III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The plaintiff asserts that the trial court improperly applied the doctrine of exhaustion of contractual remedies to her claim of intentional infliction of emotional

distress because an intentional tort by a fellow employee is not the type of matter that is subject to the grievance procedures of a collective bargaining agreement. The plaintiff also asserts, in this connection, that she and Thompson were fellow employees because they were both at the administrative level. The defendants argue that this count is factually indistinguishable from the plaintiff's constructive discharge claim, and that it "arises directly from the employment relationship, and therefore, is subject to the administrative procedures established by the collective bargaining agreement." We conclude that this claim is not subject to the grievance and arbitration procedures of the agreement.

It is true that, as the defendants contend, most of the facts underlying this count are the same as those asserted in the wrongful constructive discharge count. Moreover, they are also the same facts that are alleged in the defamation count. In framing the count alleging intentional infliction of emotional distress, the plaintiff reasserted the essential allegations of both the wrongful constructive discharge count and the defamation count, and added the allegations that Thompson intended to inflict emotional distress on the plaintiff, or should have known that would be its likely result, and that his conduct was extreme and outrageous, causing the plaintiff severe emotional distress. It is also true that a "complaint sounding in tort will not in itself prevent [resort to contractual grievance procedures] if the underlying contract embraces the disputed matter . . . ." (Internal quotation marks omitted.) *School Administrators Assn.* v. *Dow*, supra, 200 Conn. 383, quoting *Legg, Mason & Co.* v. *Mackall & Coe, Inc.*, 351 F. Sup. 1367, 1370–71 (D.D.C. 1972).

It is not true, however, notwithstanding the defendants' contrary suggestion, that simply because the

claim alleged by the plaintiff arose out of the employ-
ment relationship, the plaintiff was required to resort
to the grievance procedures of the collective bargaining
agreement governing that relationship. Not every dis-
pute that arises out of an employment relationship con-
stitutes a grievable matter. Whether a dispute is
grievable under a collective bargaining agreement
depends on the proper interpretation of the agreement.
*Brown* v. *Trans World Airlines*, 127 F.3d 337, 340–41
(4th Cir. 1997); see *School Administrators Assn.* v.
*Dow*, supra, 200 Conn. 383 (grievance procedures must
be exhausted " 'if the underlying contract embraces the
disputed matter' ").

In this case, article seven, § 7.2.1 of the agreement
defines a "grievance" as "a complaint by an administra-
tor or a group of administrators that there has been a
violation, misinterpretation or misapplication of a
specific provision or provisions of this contract to the
detriment of the administrator or administrators con-
cerned." We conclude that the plaintiff's claim that
Thompson intentionally caused her emotional distress
does not fall within that definition.

The defendants do not point to any "specific provi-
sion" of the agreement that would be violated, misinter-
preted or misapplied by Thompson's alleged tortious
conduct. Furthermore, our examination of the
agreement does not disclose any such provision. The
agreement covers, between the members of the bar-
gaining unit and the board of education, what one would
normally consider to be matters of compensation and
conditions of employment,[18] and does not cover an

[18] The agreement covers the following matters: (1) article two, "Manage-
ment Rights," which defines in categorical terms the various subjects that
the board of education reserves to itself in its management of the school
district; (2) article three, "Insurance," which defines the various insurance
benefits provided by the board to the administrators; (3) article four, "Sick
Days," "Personal Days" and "Professional Days"; (4) article five, "Vacation
Days"; (5) article six, the length of the "Work Year"; (6) article seven,

intentional tort by one employee of the board against another. Although that alleged tortious conduct arose out of the employment relationship, it is not subject to any provision of the agreement the violation of which gives rise to a grievance.

## IV

## LOSS OF PARENTAL CONSORTIUM

The minor plaintiffs contend that we should recognize a claim for loss of parental consortium by a minor child resulting from a serious injury to the child's parent. They argue, therefore, that the trial court, *Gaffney, J.*, improperly struck counts thirteen, fifteen, sixteen and seventeen of the complaint, in which they had alleged such claims. We conclude, however, that the balance of reasons and public policies tips against the recognition of such a claim. We therefore decline to do so, and we affirm that part of the judgment of the trial court.

We have defined "consortium" in the spousal context "as encompassing the services of the [injured spouse], the financial support of the [injured spouse], and the variety of intangible relations which exist between spouses living together in marriage. Prosser, Torts (4th Ed. 1971) § 124, pp. 881–82. These intangible elements are generally described in terms of affection, society, companionship and sexual relations. Comment, 'The Action for Loss of Consortium in New Mexico,' 2 N. Mex. L. Rev. 107, 108 (1972). These intangibles have also been defined as the constellation of companionship,

"Grievance Procedure"; (7) article eight, "Tuition Reimbursement"; (8) article nine, "Salaries"; (9) article ten, the definition and procedures for a "Reduction in Force"; (10) article eleven, "Assignments"; (11) article twelve, "Amendment," requiring that it be done in writing; (12) article thirteen, a traditional "Savings Clause," providing that if any provision is found unlawful the others continue in force; and (13) article fourteen, "Duration of Agreement," providing for a three year duration, with an interim obligation to negotiate in good faith on salaries for the third year.

dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage. *Brown* v. *Kistleman*, 177 Ind. 692, 98 N.E. 631 (1912); Lippman, 'The Breakdown of Consortium,' 30 Colum. L. Rev. 651 (1930); Pound, 'Individual Interests in the Domestic Relations,' 14 Mich. L. Rev. 177 (1916); Holbrook, 'The Change in the Meaning of Consortium,' 22 Mich. L. Rev. 1 (1923)." (Internal quotation marks omitted.) *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 487, 408 A.2d 260 (1979). As urged by the minor plaintiffs, in the context of the relationship between parent and child, consortium "refers to the 'loss of a parent's love, care, companionship and guidance . . . .' Note, 'The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent,' 56 B.U. L. Rev. 722, 723 (1976)."

The minor plaintiffs offer several arguments in favor of recognition of such a claim. First, they argue that the child who, through the defendant's tortious conduct, has been deprived of those aspects of the parent-child relationship, has suffered "a genuine injury, and a serious one." See R. Pound, supra, 14 Mich. L. Rev. 185 (A child "has an interest in the society and affection of the parent, at least while [the child] remains in the household. But the law has done little to secure these interests."). One of the amici curiae, the Connecticut Trial Lawyers Association (amicus), points out that we have recently reaffirmed that it is our state's public policy to promote the welfare of the family, and that the interest of children "in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent" has constitutional significance. (Internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 310, 709 A.2d 1089 (1998).

The minor plaintiffs also argue by analogy to our established recognition of a valid claim for loss of spousal consortium. See *Hopson* v. *St. Mary's Hospital*,

supra, 176 Conn. 495. Thus, in quoting the Washington Supreme Court they assert that "permitting a husband or wife but not children to recover for loss of consortium erroneously suggests that an adult is more likely to suffer emotional injury than a child." *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wash. 2d 131, 134, 691 P.2d 190 (1984). Given that we have recognized the derivative cause of action for spousal consortium, they urge us to take "the . . . logical [next step] from . . . *Hopson['s]* protect[ion of] the emotional or sentimental aspects of the husband-wife relationship" to protection of the similar aspects of the parent-child relationship.

In addition, the minor plaintiffs argue by way of analogy to our decision in *Clohessy* v. *Bachelor*, 237 Conn. 31, 49, 675 A.2d 852 (1996), in which we recognized, for the first time and subject to certain limitations, that a parent and a sibling can recover damages for the emotional anguish they had sustained by witnessing the parent's other young child being fatally injured by the defendant's negligence. The minor plaintiffs assert: "Application of this court's logic in *Clohessy* to the question of whether a tortfeasor's liability should extend to . . . loss of [parental] consortium properly instructs that the time is similarly ripe to recognize such cause of action in this state."

The minor plaintiffs argue further that permitting compensation for loss of parental consortium will enable the emotionally injured child to secure the therapy that will, in turn, help to heal the wounds caused by his or her loss. Thus, they contend, not only will the minor children benefit, "but society will also benefit if the child is able to function without emotional handicap. This may well offset any increase in insurance premiums." *Berger* v. *Weber*, 411 Mich. 1, 15, 303 N.W.2d 424 (1981).

The minor plaintiffs also point to what they characterize as "the emerging national trend recognizing such

[a] cause of action . . . ." They cite to a number of jurisdictions that have, since 1980, recognized a cause of action for loss of parental consortium.

Although we acknowledge that many of these contentions have considerable appeal, we conclude that on balance, the wiser judicial policy is not to recognize the claim for loss of consortium by a minor child. We note, as a preliminary matter, that the cause of action asserted is a form of third party liability of the defendants. That is, the minor plaintiffs seek to recover from the defendants, not for tortious harms that the defendants inflicted directly on them, but for emotional harms they suffered as a result of the defendants' tortious conduct committed against another with whom they have a close relationship, namely, their parent. Although we have never specifically said so, our cases suggest that the imposition of third party liability on a tortfeasor is an exception to the general rule of the scope of tort liability that requires satisfaction of a special policy inquiry.

Thus, we have held that, for reasons of public policy, a psychiatrist engaged to examine children for possible sexual abuse owed no duty of care to the children's father, who was the suspected abuser; *Zamstein* v. *Marvasti*, 240 Conn. 549, 559, 692 A.2d 781 (1997); a psychotherapist owed no duty of care to a third party injured by his psychiatric outpatient; *Fraser* v. *United States*, 236 Conn. 625, 632, 674 A.2d 811 (1996); a physician owed no duty of care to his patient's daughter, who suffered emotional distress from observing her mother's health deteriorate from the physician's substandard care; *Maloney* v. *Conroy*, 208 Conn. 392, 399, 545 A.2d 1059 (1988); and an attorney owed no duty of care to his client's intended beneficiaries for failing to arrange for timely execution of estate planning documents. *Krawczyk* v. *Stingle*, 208 Conn. 239, 244–46, 543 A.2d

733 (1988); see also *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 383, 698 A.2d 859 (1997) ("[t]he ability of someone other than the injured party, e.g., the [injured party's] employer, to bring or to intervene in an action against [the tortfeasor] is a clear deviation from the common law"); 2 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 6.10, pp. 334–35 ("on the whole there is no liability in negligence for economic loss unless it arises from bodily harm to [the] plaintiff or from physical damage to property in which [the] plaintiff has a proprietary interest"). More specifically related to the present case, we have held that a minor child has no cause of action for alienation of his parent's affections by a third party; *Taylor* v. *Keefe*, 134 Conn. 156, 161–62, 56 A.2d 768 (1947); that a minor child has no claim for the loss of a parent's love and affection resulting from the parent's wrongful death; *Foran* v. *Carangelo*, 153 Conn. 356, 359–62, 216 A.2d 638 (1966); and that a spouse who married a tort victim after the date of the actionable conduct has no cause of action for spousal consortium. *Gurliacci* v. *Mayer*, 218 Conn. 531, 561–64, 590 A.2d 914 (1991).

On the other hand, very few decisions have extended a tortfeasor's liability to a third party, and those decisions have relied heavily upon policy considerations. The primary example, of course, is our recognition of the claim for loss of spousal consortium. *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 496. In addition, we have also held that considerations of public policy justified extending a tortfeasor's liability to the emotional distress suffered by a bystander, where (1) the bystander was closely related to the injured victim, (2) the bystander's distress was caused by contemporaneous sensory perception of the event, (3) the victim was seriously injured, and (4) the bystander suffered serious emotional injury. *Clohessy* v. *Bachelor*, supra, 237 Conn. 52–54. Thus, it is fair to say that imposing third party

liability of the kind sought in the present case remains the exception rather than the rule. See *Berger* v. *Weber*, supra, 411 Mich. 33 (Levin, J., dissenting) ("The concept of allowing a person to recover for consequential loss resulting from physical injury to another is an idiosyncracy in the law. Reasonable limits on liability for the consequences of negligent acts must be imposed.").[19]

Our reluctance to recognize causes of action in tort based on third party liability, in the absence of satisfaction of a special policy inquiry, is based in part upon our realization that the scope of the tortfeasor's third party liability, measured only by "pure rules of foreseeability could lead to unlimited liability." *Clohessy* v. *Bachelor*, supra, 237 Conn. 50. That is because "[i]t is foreseeable that any injured person will be party to a number of relationships—with the members of his household (who may not form a traditional nuclear family), with relatives, with friends and neighbors, with employer, employees, or co-workers—and that the other party to the relationship will suffer losses, tangible and intangible, should the relationship be interrupted." *Berger* v. *Weber*, supra, 411 Mich. 29.

Moreover, where the primary victim of the tortious behavior recovers for her own injuries, those direct consequences of the wrongful conduct are compensated and the wrongdoer does not escape liability. Consequently, the fundamental policy purposes of the tort compensation system—compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct—are satisfied in large measure, and

[19] Much of our reasoning in this opinion parallels that of the dissent in *Berger* v. *Weber*, supra, 411 Mich. 18–19, because, among the judicial treatments of the question, that dissenting opinion, we think, is the most scholarly and persuasive. Henceforth, therefore, our citations to *Weber* are to the dissent, unless otherwise indicated.

"will not be vitiated if the defendant's liability is not extended further." Id., 36–37.

Furthermore, as our cases reveal, imposing liability for consequential damages often creates significant risks of affecting conduct in ways that are undesirable as a matter of policy. Before imposing such liability, it is incumbent upon us to consider those risks. Thus, in *Zamstein* v. *Marvasti*, supra, 240 Conn. 560–61, our decision not to impose upon a psychiatrist a duty of care to a suspected child abuser was based largely on our recognition of "the impermissible risk of discouraging such professionals in the future from performing sexual abuse evaluations of children altogether . . . ." Similarly, in *Fraser* v. *United States*, supra, 236 Conn. 634–35, our decision not to impose upon a psychotherapist a duty of care to a third party who was injured by the psychotherapist's outpatient was based partly on the risk of inhibiting the openness that is essential to the therapist-patient relationship and partly on the risk of over-encouraging involuntary hospitalization of the mentally ill.

Whether an additional policy consideration justifies, in any given case, the imposition of liability for consequential damages, such as those claimed by the minor plaintiffs, is determined through consideration of whether the tortfeasor owes a legal duty to the claimants. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 46–47. "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994). We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general

nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. Id., 386–87." (Internal quotation marks omitted.) *Zamstein* v. *Marvasti*, supra, 240 Conn. 558. The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy.

We acknowledge that, as a general matter, it is foreseeable that causing serious injury to a parent may have deleterious effects on the parent's minor children. In a tort case involving a claim for consequential damages, however, "[a] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. . . . *RK Constructors, Inc.* v. *Fusco Corp.*, [supra, 231 Conn. 385–86]." (Internal quotation marks omitted.) *Clohessy* v. *Bachelor*, supra, 237 Conn. 45–46.

We conclude in the present case that the general rule of limiting the tortfeasor's liability to the person directly harmed should prevail. Although, in light of the minor plaintiffs' arguments, the question is a close one, the

balance of policy considerations fails to establish the additional justification necessary to support recognition of a legal duty on the part of a tortfeasor to compensate the children of the person whom the tortfeasor has harmed directly for their loss of consortium with their parent. We reach this conclusion primarily on the basis of: the fact that recognition of the cause of action would require arbitrary limitations; the additional economic burden that recognition would impose on the general public; the uncertainty that recognition would yield significant social benefits; the substantial risk of double recovery; and the weight of judicial authority.

First, if we were to recognize the claim as asserted by the minor plaintiffs—i.e., limited to loss of *parental* consortium suffered by *minor* plaintiffs resulting from *serious* injury to the parent—we would have to impose arbitrary limitations on the scope of the cause of action in order to avoid the creation of a practically unlimited class of potential plaintiffs. In the constellation of family relationships, there are other formally recognized relationships—e.g., siblings, grandparent and grandchild, and aunt or uncle and nephew or niece—and others, less formally recognized but nonetheless just as real in an emotional sense—e.g., stepsiblings, and stepchild and stepparent[20]—that could well, depending on the case, present equally strong claims of loss of consortium. Similarly, there is nothing in the underlying rationale for recognition of the claim to confine it to *minor* children. Indeed, the majority of the Michigan Supreme Court specifically declined to "adopt the Court of

---

[20] Indeed, the amicus urges that, in recognizing the minor plaintiffs' claim, we specifically extend it to stepchildren, and to recognition of a corresponding claim for loss of filial consortium by a parent. As the amicus correctly argues, there is nothing in reason to differentiate, as a categorical matter, the emotional loss by a stepchild from that of his or her stepsibling whose natural parent was injured, and there is nothing in reason to differentiate the parent's loss of the joy and comfort of his child from that suffered by the child.

Appeals limitation to instances of severely injured parents of minor children." (Internal quotation marks omitted.) *Berger* v. *Weber*, supra, 411 Mich. 17. There undoubtedly are adult children who suffer a genuine loss of consortium by virtue of their parent's injury. In addition, there is nothing in the rationale of the claim to limit it to cases of "serious" injury to the parent. There are few causes of action that depend for their existence on the *extent* of damage caused by the tortfeasor. See, e.g., *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 493–94 (no such limitations on claim for lack of spousal consortium).

It is true that we have, in at least one other circumstance, recognized a cause of action with arbitrary limits. In *Clohessy*, we required that the bystander seeking damages for emotional distress satisfy the following four conditions: (1) the bystander must be closely related to the victim; (2) the emotional injury must be the result of the contemporaneous sensory perception of the tortious event or conduct; (3) the victim's injury must be substantial, resulting in death or serious physical injury; and (4) the bystander's emotional injury must be serious. *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. The fact that we have imposed arbitrary limits elsewhere, however, is not a persuasive argument for doing so in the present case.

Courts operating in the quintessential common-law context—that is, when they are asked to recognize a new common-law cause of action—function best, and command the most respect, when their decisions can be defended on grounds of reason and principle. Although courts are, like legislatures, often in the business of drawing lines, how we are expected to draw lines differs significantly from how the legislature is expected to draw lines. Whereas legislatures often must draw arbitrary lines, we are expected to draw lines based on reason and principle, and to rely on arbitrary limits only

when the policy reasons are sufficiently persuasive to justify performing such an extraordinary task.[21] Thus, we should be very cautious about recognizing a new cause of action that would require us to impose arbitrary conditions on its scope, and should demand a very strong showing of policy reasons before doing so. In our view, on balance, that showing does not exist here.

Second, a sound analysis of whether, as a matter of public policy, this jurisdiction should recognize a new cause of action requires some consideration, not only of its benefits to those who will assert it, but its costs to those who will pay for it. It cannot be denied that recognition of this cause of action, although creating considerable value to the families of injured parents, "will impose an added economic burden upon society." *Berger* v. *Weber*, supra, 411 Mich. 38. Because "every serious injury to a parent would engender a claim for loss of consortium on behalf of each of his or her [minor] children, the expense of settling or litigating such claims would be sizable." (Internal quotation marks omitted.) Id., quoting *Borer* v. *American Airlines, Inc.*, 19 Cal. 3d 441, 447, 563 P.2d 858, 138 Cal. Rptr. 302 (1977). Unlike the claim for spousal consortium, which has a natural boundary of a single claim arising out of any tortious transaction, "the right here debated would entail adding as many companion claims as the injured parent had minor children, each such claim entitled to separate appraisal and award. The

---

[21] Consider, for example, the different approaches of the legislature and the judiciary to the notion of bringing an action in a timely fashion. Statutes of limitations and statutes of repose impose necessarily arbitrary time limits, irrespective of the reason for the delay and of whether the belatedly sued party was harmed by the delay. The analogous judicial concept of laches, however, is based on reason and principle, not on arbitrary limits. "Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant." (Internal quotation marks omitted.) *Papcun* v. *Papcun*, 181 Conn. 618, 620, 436 A.2d 282 (1980).

defendant's burden would be further enlarged if the claims were founded upon injuries to both parents. Magnification of damage awards to a single family derived from a single [incident] might well become a serious problem to a particular defendant as well as in terms of the total cost of such enhanced awards to the insured community as a whole." (Internal quotation marks omitted.) *Berger* v. *Weber*, supra, 38–39, quoting *Russell* v. *Salem Transportation Co.*, 61 N.J. 502, 506, 295 A.2d 862 (1972). Thus, although the creation of such third party claims as loss of spousal consortium and bystander emotional distress "generated marginal additional costs, recognizing a separate right of recovery in members of a tort victim's family creates a potential for additional liability in a large number of cases. [Moreover] a tort victim is likely to have more [minor] children than spouses." *Berger* v. *Weber*, supra, 39. "The administrative expense of reviewing children's claims and the cost of settling or litigating them [is likely to] be considerable and [is likely to] require significant increases in insurance premiums." Id., 40. "There is a limit to the range of injuries and the dollar amount of recovery which can be spread across society through the interaction of the tort litigation and insurance systems." Id., 41.[22]

In our view, the proposed offsetting value asserted by the minor plaintiffs—namely, that recovery will give the injured minor child the wherewithal to heal her wounds, thereby helping both her and society at large—is too conjectural, particularly when viewed against the more easily predicted economic cost of the claim, if recognized. Although such a personal and social benefit

---

[22] This difference in the scope of liability and its attendant economic costs distinguishes the asserted recognition of the claim in the present case from the claim for bystander emotional distress that we recognized in *Clohessy*. The costs of the cause of action for bystander emotional distress can be expected to be marginal, as compared to those of the claim for loss of parental consortium by minor children.

is a possible outcome in some cases, it is very difficult to say with any confidence whether it will obtain in any more than a handful of cases, whether any award rendered will in fact be so applied, and whether "compensation will be received before the passage of time or the parent's recovery has worked a better adjustment." Id., 42. Thus, the uncertainty of its social benefits, when weighed against the likelihood of its social costs, argues persuasively against recognition of the cause of action. See id., 42–43.

Third, recognition of the claim would create a significant risk of double recovery. We do not doubt that under current law and practice, a parent would be entitled, as part of her own damages for loss of life's ordinary activities, to recover for her inability to care for her minor children. Indeed, in this case the plaintiff on her own behalf seeks compensation for having been deprived of the companionship of her children during the week. When a close relationship between two people is disrupted, it is difficult to differentiate between the loss suffered by each. Thus, to "permit a child to recover for loss of an injured parent's society and companionship while the parent is also compensated for injury to the relationship creates a substantial risk of double recovery because of the difficulty of distinguishing the respective losses of the parties." Id., 36.

It is true, as the minor plaintiffs argue, that we ordinarily leave such difficult questions of damages to the jury's ability to sort out the appropriate limits under proper instructions from the court. That willingness to countenance uncertainty in the calculation of damages for intangible losses is strongest in cases where the plaintiff is the primary victim of the tortious conduct, because it is there that the fundamental purposes of tort recovery—compensation, shifting or spreading of losses, and deterrence—must be vindicated. Where,

however, the primary victim is already being compensated and, therefore, those purposes are being served, we should be cautious about creating a cause of action that would combine *two* elements of damages that will be difficult to quantify: (1) the nature of the loss asserted by the minor child; and (2) the line between the minor child's and his parent's loss. This need for caution argues strongly against recognition of the claim.

Fourth, the overwhelming weight of authority in the nation is against recognition of a cause of action for loss of parental consortium. Thus, we disagree with the minor plaintiffs that there is an "emerging national trend" in favor of such recognition. The following jurisdictions have declined to recognize the cause of action: *DeLoach* v. *Companhia de Navegacao Lloyd Brasileiro*, 782 F.2d 438 (3d Cir. 1986) (general maritime law); *Pleasant* v. *Washington Sand & Gravel Co.*, 262 F.2d 471 (D.C. Cir. 1958); *Green* v. *A.B. Hagglund & Soner*, 634 F. Sup. 790 (D. Idaho 1986); *Lewis* v. *Rowland*, 287 Ark. 474, 701 S.W.2d 122 (1985); *Borer* v. *American Airlines, Inc.*, supra, 19 Cal. 3d 441; *Lee* v. *Dept. of Health*, 718 P.2d 221 (Colo. 1986); *Zorzos* v. *Rosen*, 467 So. 2d 305 (Fla. 1985); *W. J. Bremer Co.* v. *Graham*, 169 Ga. App. 115, 312 S.E.2d 806 (1983), cert. denied, 252 Ga. 36, 312 S.E.2d 787 (1984); *Halberg* v. *Young*, 41 Haw. 634 (1957), implied overruling recognized by *Marquardt* v. *United Airlines, Inc.*, 781 F. Sup. 1487 (D. Haw. 1992); *Karagiannakos* v. *Gruber*, 274 Ill. App. 3d 155, 157, 653 N.E.2d 932, cert. denied, 164 Ill. 2d 565, 660 N.E.2d 1271 (1995) (noting "[a] clear and consistent line of cases in the Illinois Appellate Court hold[ing] that a minor has no cause of action for loss of parental consortium when the parent survives"); *Dearborn Fabricating & Engineering Corp., Inc.* v. *Wickham*, 551 N.E.2d 1135 (Ind. 1990); *Audubon-Exira Ready Mix, Inc.* v. *Illinois Central Gulf R. Co.*, 335 N.W.2d 148 (Iowa 1983) (denying common-law cause of action for

loss of parental consortium on grounds that such loss was recoverable by parent under Iowa statute); *Klaus* v. *Fox Valley Systems, Inc.*, 259 Kan. 522, 912 P.2d 703 (1996); *Durepo* v. *Fishman*, 533 A.2d 264 (Me. 1987); *Gaver* v. *Harrant*, 316 Md. 17, 557 A.2d 210 (1989); *Salin* v. *Kloempken*, 322 N.W.2d 736 (Minn. 1982); *Thompson* v. *Love*, 661 So. 2d 1131 (Miss. 1995); *Barbera* v. *Brod-Dugan Co.*, 770 S.W.2d 318 (Mo. App. 1989); *Bradford* v. *Union Electric Co.*, 598 S.W.2d 149 (Mo. App. 1979); *Guenther* v. *Stollberg*, 242 Neb. 415, 495 N.W.2d 286 (1993); *Motenko* v. *MGM Dist., Inc.*, 112 Nev. 1038, 921 P.2d 933 (1996); *Russell* v. *Salem Transportation Co.*, supra, 61 N.J. 502; *DeAngelis* v. *Lutheran Medical Center*, 84 App. Div. 2d 17, 445 N.Y.S.2d 188 (1981), aff'd, 58 N.Y.2d 1053, 449 N.E.2d 406, 462 N.Y.S.2d 626 (1983); *Vaughn* v. *Clarkson*, 324 N.C. 108, 376 S.E.2d 236 (1989); *Butz* v. *World Wide, Inc.*, 492 N.W.2d 88 (N.D. 1992); *Norwest* v. *Presbyterian Intercommunity Hospital*, 52 Or. App. 853, 631 P.2d 1377 (1981), aff'd, 293 Or. 543, 652 P.2d 318 (1982); *Steiner* v. *Bell Telephone Co. of Pennsylvania*, 358 Pa. Super. 505, 517 A.2d 1348 (1986), aff'd, 518 Pa. 57, 540 A.2d 266 (1988); *Taylor* v. *Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996); *Still* v. *Baptist Hospital, Inc.*, 755 S.W.2d 807 (Tenn. App. 1988). The following jurisdictions have recognized the cause of action: *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987); *Villareal* v. *Dept. of Transportation*, 160 Ariz. 474, 774 P.2d 213 (1989); *Higley* v. *Kramer*, 581 So. 2d 273 (La. App.), cert. denied, 583 So. 2d 483 (La. 1991) (citing La. Civ. Code Ann. art. 2315); *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980), superseded by statute, as recognized by *Corrigan* v. *General Electric Co.*, 406 Mass. 478, 480, 548 N.E.2d 1238 (1990) ("[t]he Legislature . . . has . . . nullified the *Ferriter* decision by preventing recovery for loss of consortium by spouses or children of employees subject to the

provisions of the Workers' Compensation Act, [Mass. Gen. Laws] c. 152, § 24, as amended through St. 1985, c. 527, § 35"); *Berger* v. *Weber*, supra, 411 Mich. 1; *Pence* v. *Fox*, 248 Mont. 521, 813 P.2d 429 (1991); *Gallimore* v. *Children's Hospital Medical Center*, 67 Ohio St. 3d 244, 617 N.E.2d 1052 (1993); *Williams* v. *Hook*, 804 P.2d 1131 (Okla. 1990); *Reagan* v. *Vaughn*, 804 S.W.2d 463 (Tex. 1990); *Hay* v. *Medical Center Hospital of Vermont*, 145 Vt. 533, 496 A.2d 939 (1985); *Ueland* v. *Pengo Hydra-Pull Corp.*, supra, 103 Wash. 2d 131; *Belcher* v. *Goins*, 184 W. Va. 395, 400 S.E.2d 830 (1990); *Theama* v. *Kenosha*, 117 Wis. 2d 508, 344 N.W.2d 513 (1984); *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, 797 P.2d 1171 (Wyo. 1990). In addition, § 707A of the Restatement (Second) of Torts declines to recognize the cause of action. It provides: "One who by reason of his tortious conduct is liable to a parent for illness or other bodily harm is not liable to a minor child for resulting loss of parental support and care." 3 Restatement (Second), Torts § 707A (1977).

The fact that the minor plaintiffs have suffered a "genuine injury" is insufficient, at least in and of itself, to serve as a basis for imposing third party liability on the defendants. Such an injury is presumably present in all of the cases in which, for policy reasons, we have nonetheless declined to impose such liability. See, e.g., *Zamstein* v. *Marvasti*, supra, 240 Conn. 560–61 (plaintiff father of children harmed emotionally and in exercise of custodial rights as result of negligent evaluation by defendant psychiatrist); *Fraser* v. *United States*, supra, 236 Conn. 632–33 (plaintiff third party physically harmed by outpatient of negligent defendant psychiatrist); *Maloney* v. *Conroy*, supra, 208 Conn. 403 (plaintiff daughter emotionally harmed by witnessing results of defendant physicians' negligent treatment of mother); *Krawczyk* v. *Stingle*, supra, 208 Conn. 244–46 (plaintiff

intended beneficiaries economically harmed by defendant attorney's untimely preparation of estate planning documents). Indeed, if the presence of a genuine injury were legally sufficient to impose third party liability, the only limitations on such liability would be the far reaches of foreseeability.

Furthermore, although it may be appropriate, for purposes of determining the scope of tort liability, to assign some weight to the fact that the parent-child relationship is constitutionally protected, as the amicus suggests, the amount of that weight is limited. Not every constitutional right or relationship gives rise to tort liability for its violation. Compare, e.g., *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 627 A.2d 909 (1993) (no private cause of action based on violation of due process clause of state constitution, article first, § 8), with *Binette* v. *Sabo*, 244 Conn. 23, 710 A.2d 688 (1998) (private cause of action based on violation of search and seizure provisions of state constitution, article first, §§ 7 and 9). In addition, the fundamental purposes of tort liability; see *Berger* v. *Weber*, supra, 411 Mich. 36–37; are not ordinarily congruent with the purposes behind, or the appropriate analysis of, constitutional provisions.

Finally, although the analogy to *Hopson* has some appeal because the loss of spousal consortium bears some resemblance to the loss of parental consortium asserted in the present case, and because the parent-child relationship may well be as commanding of legal protection in many respects as the spousal relationship, there are also significant differences between the two. These differences arise out of the fact that the relationship between spouses is different in kind as well as source from the parent-child relationship. Marriage is a "unique human relationship"; *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991); "the closest entity recognized by society"; *Albert* v. *McGrath*, 278

F.2d 16, 18 (D.C. Cir. 1960); "a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Griswold* v. *Connecticut*, 381 U.S. 479, 486, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). Most important, the spousal relationship is based on notions of commitment between adults. " '[T]he formal marriage relation forms the necessary touchstone to determine the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance.' " *Gurliacci* v. *Mayer*, supra, 218 Conn. 564; see also *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487 (emphasizing that elements that make up "consortium," including " 'the constellation of companionship, dependence, reliance, affection, sharing and aid . . . are legally recognizable, protected rights arising out of the *civil contract of marriage*' " [emphasis added]).

Moreover, when we decided *Hopson*, the judicial trend was in favor of a claim for spousal consortium. See *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494–95 (recognizing "the movement of the law in other jurisdictions where, since 1950, a growing majority of courts have come to recognize a right of action for loss of consortium in either spouse"). That is not, however, the case here.

In addition, in any given case there will be only one spousal consortium claim—even in a case in which the primary plaintiff may have married or remarried during the course of his injuries—because only the spouse at the time of the tort may sue for consortium. *Gurliacci* v. *Mayer*, supra, 218 Conn. 561–64. Indeed, the limitation to only one claim for loss of spousal consortium may be seen as resting partly on public policy reasons. See id., 564 n.28. By contrast, in any given case, there would be as many claims for loss of parental consortium as there are minor children. As we have noted, this contrast sets a natural boundary for the scope of the

claim for loss of spousal consortium that is absent from the claim for loss of parental consortium, and imposes a far greater social cost than the claim for loss of spousal consortium.

The final weak link in the chain of analogy to *Hopson* is that a spouse can choose to bring or forego his derivative consortium claim and thereby subject himself or not to the necessary intrusion by the other side of the case into the details of the spousal relationship. By contrast, a minor child cannot make that choice; it would be made for him, ordinarily by the parent who brings the primary action. Furthermore, this intrusion is likely to be extensive.[23] Although, when the minor child is the person directly injured by the tortfeasor and the minor child claims damages for losing his life's activities with his parent, the law countenances such an intrusion, the necessity for it is reduced when the child is not the person directly injured. That lesser degree of necessity counsels against recognizing a cause of action that will ordinarily involve such an extensive intrusion.

We acknowledge that as in any case that involves the question of whether our public policy, as a matter of common law, should recognize a new cause of action, the ultimate decision comes down to a matter of judgment in balancing the competing interests involved. We conclude that the balance of interests lies in declining

---

[23] The amicus accurately asserts that a searching inquiry will be required into "the nature and quality of the relationship between the parents and the child . . . ." This will necessarily include "a thorough and complete examination of the love and affection and conduct of each toward the other; the society and companionship that was afforded to the . . . child by the . . . [parent] . . . the personality, disposition and character of the [child] and the disposition and susceptibility of the [child] to suffer from the loss." Thus, not only will there have to be evidence on these factors and the jury be instructed to take all of them into account, but the defendant will have to be permitted to examine the child and parents regarding them by way of discovery and deposition.

to recognize a cause of action for loss of parental consortium by a minor child.

The judgment is reversed in part and the case is remanded with direction to deny the defendants' motion to dismiss the substitute complaint of the plaintiffs and for further proceedings according to law on the substitute complaint; the judgment is affirmed with respect to the counts of the original complaint by the minor plaintiffs.

In this opinion CALLAHAN, C. J., and NORCOTT, KATZ, PALMER and MCDONALD, Js., concurred.

BERDON, J., with whom KATZ, J., joins, concurring in part and dissenting in part. I agree with and join in parts I, II and III of the majority opinion, but I disagree with part IV concerning the rejection of the claim for loss of consortium (sometimes referred to as the loss of society and companionship of a parent)[1] by a minor child resulting from a serious injury to the child's parent. The majority holds that we should recognize an action for loss of spousal consortium under our jurisprudence, but that, as a matter of law, we should reject compensation for a minor child who is injured because he is deprived of the love, affection, care, attention, companionship, comfort and protection of a parent as the result

---

[1] "While the term 'loss of consortium' has been attached to the children's claim, the broader term, 'loss of society and companionship,' is equally appropriate. Use of the latter term avoids the narrower construction connoting this right derives primarily from the sexual relationship incident to marriage. Indeed, loss of consortium is 'a useful though ambiguous term having a rather old-fashioned ring today.' H. Clark, Domestic Relations § 10.1 (1968). While companionship may include sexual relations [see, e.g., W. Prosser, Torts (4th Ed. 1971) § 125, p. 889], courts have continued to regard loss of consortium to embrace all of those values—tangible and intangible—inherent in the family relationship. In his treatise, Clark . . . asserts that the term loss of consortium is equally appropriate in reference to the parent-child relationship to summarize 'the multitude of rights and duties binding parents to their children and vice versa.' [H. Clark, supra, § 10.1]." *Reighley* v. *International Playtex, Inc.*, 604 F. Sup. 1078, 1081 (D. Colo. 1985).

of the negligence of a third party. Unfortunately, the issue before us is not raised under an ideal fact pattern,[2] but when this court rejects this right for children— indeed, children of tender years—to receive compensation for the loss of society and companionship of a parent as a result of the wrongful conduct of another, it does so for all cases.

I predict that this court will soon look on the decision in this case as the 1979 *Hopson*[3] court viewed the 1911 *Marri*[4] decision in which a spousal loss of consortium claim was denied: that is, this court will conclude that the "reasoning [of the majority in this case is] no longer persuasive and its result [is] unsound." *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 494, 408 A.2d 260 (1979). But, unfortunately, in the interim, children who may be seriously injured as a result of the loss of society and companionship of a parent—injuries that can have an effect on the children for the remainder of their lives—will be denied the right of any compensation

---

[2] The facts of this case do not set forth the ideal scenario with respect to this cause of action—that is, the plaintiff children in this case sought damages arising out of injuries their mother experienced as a result of an alleged wrongful termination of her employment. To shape our law predicated on a fact pattern that has no appeal not only undermines our jurisprudence, but denigrates the common sense of our juries that appropriately dispose of unwarranted claims.

Instead of the facts in the present case, assume these facts: As a result of another driver's negligent operation of his automobile, a mother is paralyzed and suffers severe brain injuries resulting in the impairment of her visual and speech functions. At the time of the accident, she has two children, ages two and six. The mother has an action based upon negligence against the driver; and the father has a cause of action against the driver for the loss of spousal consortium; *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 496, 408 A.2d 260 (1979); but, according to the majority, the children would not. That is simply not logical. It would seem to me that the children in this scenario, who are deprived of their mother's care, guidance, love and affection, suffered serious *foreseeable damages* and the policy of our law should permit them to recover against the negligent driver.

[3] *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 408 A.2d 260 (1979).

[4] *Marri* v. *Stamford Street R. Co.*, 89 Conn. 9, 78 A. 582 (1911).

even if it is the result of the infliction of an intentional tort on the parent. In my view, "[l]ogic, justice and public policy demand [that this court adopt this cause of action in order to protect the] child's interest in the family relationship." *Williams* v. *Hook*, 804 P.2d 1131, 1136 (Okla. 1990).

First, as an overview, the reasoning that led this court to adopt causes of action for spousal loss of consortium and bystander emotional distress has equal applicability to a cause of action for loss of parental consortium. In *Hopson*, this court concluded that "the effect of the *Marri* decision [denying the plaintiff husband's claim for loss of consortium] is to deny the existence of any harm where harm is *most assuredly to be expected*. It is a well-settled principle of law that a tortfeasor takes his victim as he finds him. Should the victim be married, it follows that the spouse may suffer personal and compensable, though not physical, injuries as a direct result of the defendant's negligence and that such injuries should not go uncompensated." (Emphasis added.) *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 493. Likewise, because of the crucial role of the parent in a child's life, "[s]hould the victim be [a parent], it follows that the [child] may suffer personal and compensable, though not physical, injuries as a direct result of the defendant's negligence . . . ." Id.; *Villareal* v. *Dept. of Transportation*, 160 Ariz. 474, 479, 774 P.2d 213 (1989) ("[F]oreseeability of harm to a victim's child is as equally foreseeable as harm to a victim's spouse. Because we have already recognized a cause of action for the victim's spouse, we reject this argument [which would deny compensation] . . . ."); *Hay* v. *Medical Center Hospital of Vermont*, 145 Vt. 533, 539, 496 A.2d 939 (1985) ("we see little difference in terms of remoteness between the situation of a spouse seeking to recover for loss of consortium, and that of a minor child similarly seeking recovery for loss of consortium"); W.

Prosser, Torts (4th Ed. 1971) § 125, p. 897 ("[i]t is particularly difficult when recovery is permitted to the wife, [to deny it] to the child").

Furthermore, the logical extension of *Clohessy* v. *Bachelor*, 237 Conn. 31, 675 A.2d 852 (1996), would be to recognize the loss of parental consortium claim for a child. In *Clohessy*, we concluded that bystander emotional distress, the emotional anguish a person sustains by witnessing a parent or sibling being seriously injured as a result of an accident caused by the negligence of another, was compensable. Id., 46–47. Although the factual predicate in *Clohessy* was that of a mother witnessing a child fatally injured by a negligent driver, we adopted the rule affording a cause of action for bystander emotional distress for anyone " 'closely related to the injury victim,' " including a child with respect to his or her parent. Id., 52. We reached this result after determining that the harm suffered by a close relative of an injured victim is " 'as foreseeable as the injury itself, for few persons travel through life alone' "; id., 47; and that protection of the "personal emotional stability [of the injured victim's close relative] is worthy of legal protection against unreasonable conduct." (Internal quotation marks omitted.) Id., 46. Likewise, if the loss of spousal consortium and the emotional distress of a bystander are foreseeable, then logically, the severe emotional anguish a child will suffer as a result of the loss of his parent's consortium is just as foreseeable. *Hoffman* v. *Dautel*, 189 Kan. 165, 168, 368 P.2d 57 (1962) ("[i]t is common knowledge that a parent who suffers serious physical or mental injury is unable to give his minor children the parental care, training, love and companionship in the same degree as he might have but for the injury"). Moreover, as will be discussed herein, the child's interest in the parent's love, affection, care and guidance is just as

deserving of legal protection as the spouse's interest in the same elements.

Despite the majority's concession that the specific harm alleged in loss of parental consortium actions is foreseeable, it rejects the cause of action on the basis of policy considerations. Upon review of the majority's arguments, it is clear that they, like the arguments rejected in *Hopson* for upholding the decision in *Marri*, are either without merit, without foundation or based upon exaggerated claims.

I

The majority first argues that the logic underlying our decision to adopt the cause of action for loss of spousal consortium in *Hopson* is not applicable to a parental consortium cause of action because the spousal relationship is different in source and kind from the parent-child relationship. According to the majority, the spousal relationship is different in kind from the parent-child relationship because it is a " 'unique human relationship,' " and " 'the closest entity recognized by society.' " I do not question this close bond between husband and wife, but I find the majority's distinction unpersuasive because the parent-child relationship is "the earliest and most hallowed of the ties that bind humanity . . . ." (Internal quotation marks omitted.) *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, 797 P.2d 1171, 1173 (Wyo. 1990). As a child gets older, of course, that relationship typically wanes, and, consequently, the damages to be awarded a child for loss of parental consortium decrease accordingly. Indeed, once a child has reached complete independence there generally would be no basis for a claim of loss of parental consortium.

The "parent-child relationship is . . . the wellspring from which other family relationships derive . . . ." *Villareal* v. *Dept. of Transportation*, supra, 160 Ariz.

478; S. Ridgeway, "Loss of Consortium and Loss of Services Actions: A Legacy of Separate Spheres," 50 Mont. L. Rev. 349, 368 (1989) ("spousal and parent-child relationships are the basis of the American family").[5] For these reasons, many jurisdictions have concluded that "[t]he claim for loss of parental consortium . . . is not sufficiently distinguishable from . . . spousal consortium claims in injury cases . . . to warrant non-recognition." *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 994 (Alaska 1987); see, e.g., *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 533; *Belcher* v. *Goins*, 184 W. Va. 395, 400 S.E.2d 830 (1990); *Theama* v. *Kenosha*, 117 Wis. 2d 508, 344 N.W.2d 513 (1984).

The majority argues that the spousal relationship is different in source from the parent-child relationship because it is based on notions of commitment, and because the protected rights of spouses that arise out of their marriage contract are similar to the elements of consortium. The public policy set forth by our statutes and case law demonstrate, however, that the parent-child relationship, like the spousal relationship, is based on the notion of commitment, and is the source of rights similar to the elements of spousal consortium—"the rights of the child to [the] support, aid, protection, affection and society of the parent . . . ." *Pence* v. *Fox*, 248 Mont. 521, 526, 813 P.2d 429 (1991).

---

[5] The fundamental importance of the parent-child relationship to our society is illustrated by the fact that, in most cases in which an adult is seriously injured, the victim's child will suffer more deprivation than the victim's spouse. See, e.g., *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 537–38 ("Not only are the losses suffered by a parent and a child similar in many respects, but the child is in a uniquely difficult position to make up for the loss of a parent. '[W]hile an adult is capable of seeking out new relationships in an attempt to fill in the void of his or her loss, a child may be virtually helpless in seeking out a new adult companion.' "); note, "The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent," 56 B.U. L. Rev. 722, 742 (1976) ("[s]ince the child in his formative years requires emotional [nurturing] to develop properly, the loss of love, care and companionship *is likely to have a more severe effect on him than on an adult*" [emphasis added]).

According to our legislature, "[t]he public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . ." General Statutes § 17a-101 (a). Holdings of this court provide further proof of the commitment a parent owes his or her child, and the child's legally recognized right to his parent's consortium. In the case of *In re Juvenile Appeal, (Docket No. 9489)*, 183 Conn. 11, 15, 438 A.2d 801 (1981), this court acknowledged that a parent is obligated to: "(1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) . . . supply the necessary food, clothing, and medical care; (4) . . . provide an adequate domicile, and (5) . . . furnish social and religious guidance." (Internal quotation marks omitted.) In *Pamela B. v. Ment*, 244 Conn. 296, 310, 709 A.2d 1089 (1998), we held that the "right to family integrity . . . encompasses the reciprocal rights of both parent and children . . . the interest of the parents in the companionship, care, custody and management of his or her children . . . *and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.)

Moreover, decisions of the United States Supreme Court over the last thirty years reflect a growing awareness that the legal status of children has changed, like that of women, "from that of a chattel to that of a person entitled to legal redress for wrongs done to [the child]." Note, "The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent," 56 B.U. L. Rev. 722, 742 (1976). For example, children are now recognized as

persons under the United States constitution,[6] and they enjoy rights protected by the first amendment,[7] and the fourteenth amendment.[8] In keeping with this recognition of children's rights, we must afford children the right to bring an action against a tortfeasor for injuries they suffer as a result of the injury inflicted on their parents.

## II

The majority asserts that this court should not adopt the loss of parental consortium cause of action because the weight of judicial authority is opposed to it. Contrary to the majority's assertion, there is an emerging national trend to recognize such claims by children. Before 1980, none of the jurisdictions accepted this claim;[9] yet, today, in 1998, fifteen jurisdictions recognize it.[10] Moreover, "able criticisms [from scholars] have

[6] See *Tinker* v. *Des Moines Independent Community School District*, 393 U.S. 503, 511, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (right of students to freedom of expression in public school).

[7] See, e.g., *Tinker* v. *Des Moines Independent Community School District*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969); *Board of Education* v. *Barnette*, 319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) (right to refuse to salute flag).

[8] See, e.g., *Goss* v. *Lopez*, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) (right to notice and informal hearing in school discipline cases); *Gomez* v. *Perez*, 409 U.S. 535, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973) (right of illegitimate children to maintain civil action for nonsupport against parents).

[9] This, of course, explains why the Restatement (Second) of Torts, § 707A (1976), which predates all of the minority view cases, does not support the adoption of this cause of action. When the Restatement "was revised in 1969, the American Law Institute . . . [denied] liability to a minor child for loss of parental support and care, with the comment that the rule was stated with some reluctance on the part of several of the drafting group, and under compulsion of the case law." (Internal quotation marks omitted.) *Norwest* v. *Presbyterian Intercommunity Hospital*, 293 Or. 543, 546, 652 P.2d 318 (1982). In light of the trend in the case law since the Restatement was published, this court should not look to § 707A for support on this issue.

[10] Those states that have adopted a child's cause of action for the loss of parental consortium include the following in reverse chronological order: *Gallimore* v. *Children's Hospital Medical Center*, 67 Ohio St. 3d 244, 617 N.E.2d 1052 (1993); *Marquardt* v. *United Airlines, Inc.*, 781 F. Sup. 1487

been mounted against [rejecting this cause of action][11] and it must now be recognized that the more liberal view may well gain further adherents." W. Prosser & W.

(D. Haw. 1992); *Higley* v. *Kramer*, 581 So. 2d 273 (La. App.), cert. denied, 583 So. 2d 483 (La. 1991); *Pence* v. *Fox*, supra, 248 Mont. 521; *Williams* v. *Hook*, supra, 804 P.2d 1131; *Reagan* v. *Vaughn*, 804 S.W.2d 463 (Tex. 1990); *Belcher* v. *Goins*, supra, 184 W. Va. 395; *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, supra, 797 P.2d 1171; *Villareal* v. *Dept. of Transportation*, supra, 160 Ariz. 474 (reversing *Jeune* v. *Del E. Webb Construction Co.*, 77 Ariz. 226, 269 P.2d 723 [1954]); *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, supra, 734 P.2d 991; *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wash. 2d 521, 691 P.2d 190 (1984); *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 533; *Theama* v. *Kenosha*, supra, 117 Wis. 2d 508; *Berger* v. *Weber*, 82 Mich. App. 199, 267 N.W.2d 124 (1978), aff'd, 411 Mich. 1, 303 N.W.2d 424 (1981); *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980); see also Fla. St. Ann. § 768.0415 (West Sup. 1995).

Those states that have adopted a cause of action for parents for the loss of a child's consortium include the following in reverse chronological order. *United States* v. *Dempsey*, 635 So. 2d 961 (Fla. 1994); *Jameson* v. *Hawthorne*, 635 A.2d 1167 (R.I. 1994); *Enochs* v. *Brown*, 872 S.W.2d 312 (Tex. App. 1994); *Pino* v. *Gather*, 633 So. 2d 638 (La. App. 1993); *Gallimore* v. *Children's Hospital Medical Center*, supra, 67 Ohio St. 3d 244; *Gillispie* v. *Beta Construction Co.*, 842 P.2d 1272 (Alaska 1992); *Masaki* v. *General Motors*, 71 Haw. 1, 780 P.2d 566 (1989); *Davis* v. *Elizabeth General Medical Center*, 228 N.J. Super. 17, 548 A.2d 528 (1988); *Jacobs* v. *Anderson Building Co.*, 430 N.W.2d 558 (N.D. 1988); *Frank, M.C., P.C.* v. *Superior Court*, 150 Ariz. 228, 722 P.2d 955 (1986); *Shockley* v. *Prier*, 66 Wis. 2d 394, 225 N.W.2d 495 (1975); *Hayward* v. *Yost*, 72 Idaho 415, 242 P.2d 971 (1952); see also Mass. Ann. Laws ch. 231, § 85X (Law. Co-op. Sup. 1994); Wash. Rev. Code Ann. § 4.24.010 (West 1988). The courts in Illinois are divided: compare *Barkei* v. *Delnor Hospital*, 176 Ill. App. 3d 681, 531 N.E.2d 413 (1988) (no cause of action) with *Dymek* v. *Nyquist*, 128 Ill. App. 3d 859, 469 N.E.2d 659 (1984) (recognizing cause of action).

[11] Most law review commentaries favor recognition of the loss of parental consortium cause of action: T. DiResta, "Children's Rights: The Parental Consortium Dilemma and Connecticut Law," 14 Quinnipiac L. Rev. 437 (1994) (tracing history of cause of action for loss of consortium to present and advocating adoption of cause of action for loss of parental consortium in Connecticut); note, "*Ipcock* v. *Gilmore*: North Carolina's Refusal to Extend Recovery to the Infant Secondary Tort Victim," 66 N.C. L. Rev. 1337 (1988); note, "Parental Consortium in Florida: Our Children Have No Place to Turn," 13 Nova L. Rev. 295 (1988); R. Petrilli, "A Child's Right to Collect for Parental Consortium Where Parent is Seriously Injured," 26 J. Fam. L. 317, 347 (1988); comment, "Loss of Parental Consortium: Why Children Should Be Compensated," 18 Pac. L.J. 233, 258 (1986); note "Compensating the Child's Loss of Parental Love, Care and Affection," 1983 U. Ill. L. Rev. 293, 316 (1983); note, "Torts—

Keeton, Torts (5th Ed. 1984) § 125, p. 936. Furthermore, many of our state trial judges, relying on the underlying logic of such cases as *Hopson* and *Clohessy*, have made a determination that the fundamental policy of the law supports extending a tortfeasor's responsibility to the child of an injured victim.[12]

Loss of Consortium—Right of a Child to a Cause of Action for Loss of Society and Companionship When the Parent is Tortiously Injured," 28 Wayne L. Rev. 1877, 1887 (1982); note, "Child's Right to Sue for Negligent Disruption of Parental Consortium," 22 Washburn L.J. 78, 101 (1982); note, "Expanding Loss of Parental Society and Negligent Infliction of Emotional Distress—Allowing Recovery Despite Worker's Compensation Exclusive Remedy Provisions: *Ferriter v. Daniel O'Connell's Sons, Inc.*," 13 U. Tol. L. Rev. 1401, 1435 (1982); R. Cooney & K. Conway, "The Child's Right to Parental Consortium," 14 J. Marshall L. Rev. 341, 351 (1981); note, "Actions for Loss of Consortium in Washington: The Children Are Still Crying," 56 Wash. L. Rev. 487, 492 (1981); note, "Recovery for Loss of the Injured Parent's Society: *Ferriter v. Daniel O'Connell's Sons, Inc.*," 3 Det. C.L. Rev. 987, 1005 (1981); note, "Torts—Cause of Action for Loss of Parental Society Due to Negligent Act Recognized. *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980)," 12 Cumb. L. Rev. 211, 225 (1981); comment, "The Child's Cause of Action for Loss of Consortium," 5 San Fern. V. L. Rev. 449, 467 (1977); J. Love, "Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship," 51 Ind. L.J. 590, 634 (1976); note, supra, 56 B.U. L. Rev. 742; note, "The Child's Claim for Loss of Consortium Damages: A Logical and Sympathetic Appeal," 13 San Diego L. Rev. 231, 251 (1975); R. Pound, "Individual Interests in the Domestic Relations," 14 Mich. L. Rev. 177, 185–86 (1916).

The following treatises criticize states for refusing to extend a tortfeasor's liability to children of accident victims: H. Clark, Domestic Relations (1968) § 10.6, p. 279 ("[i]f the argument for recognizing the wife's claim for loss of consortium is convincing, it should be equally so with respect to the child's claim"); W. Prosser, supra, § 125, p. 896 ("[i]t is not easy to understand and appreciate this reluctance to compensate the child who has been deprived of the care, companionship and education of his mother, or for that matter his father, through the defendant's negligence").

[12] My research indicates that the following eighteen trial judges of this state have recognized a child's cause of action for loss of parental consortium: *Moreira v. Tamura*, Superior Court, judicial district of Danbury, Docket No. 324663 (May 20, 1997) (1997 W.L. 297738) (*Stodolink, J.*); *Jacobs v. G.E. Co.*, Superior Court, judicial district of Waterbury, Docket No. CV960135905 (March 24, 1997) (19 Conn. L. Rptr. 330) (*Leheny, J.*); *Falconieri v. Choquette*, Superior Court, judicial district of New Haven, Docket No. CV960383034S (September 26, 1996) (17 Conn. L. Rptr. 658) (*Corradino, J.*); *Reed v. Norwalk Hospital*, Superior Court, judicial district of Stamford-Norwalk, Docket No.

Even if the majority were correct that the clear trend across the United States is to reject this cause of action "we are not bound by the mere weight of judicial precedent but rather by the rule which embodies the more persuasive reasoning." *Belcher* v. *Goins*, supra, 184 W. Va. 402. Simply put, we do not decide the public policy of this state based upon the numbers game. The "[n]ovelty of an asserted [cause of action] and lack of common-law precedent . . . are no reasons for denying its existence." *Salin* v. *Kloempken*, 322 N.W.2d 736, 741 (Minn. 1982). "Whether we are the first state—or the fiftieth state—to adopt a specific legal proposition, our decision inevitably will be based upon what we deem to be in the best interests of justice and of the citizens of [this] State . . . at the time the question is presented

CV950146525 (August 27, 1996) (17 Conn. L. Rptr. 486) (*Stevens, J.*); *Orsini* v. *Wells Fargo Armored Service Corp.*, Superior Court, judicial district of Waterbury, Docket No. CV960131445S (August 2, 1996) (1996 W.L. 456965) (*Vertefeuille, J.*); *Condon* v. *Guardiani*, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. CV950052203S (March 16, 1996) (16 Conn. L. Rptr. 466) (*Skolnick, J.*); *Davis* v. *Davis*, Superior Court, judicial district of Middlesex, Docket No. CV95077180 (March 15, 1996) (1996 W.L. 156011) (*Stanley, J.*); *Foschini* v. *Leblanc*, Superior Court, judicial district of Waterbury, Docket No. 0121072 (March 17, 1995) (14 Conn. L. Rptr. 167) (*Flynn, J.*); *Dastych* v. *New Britain General Hospital*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV940537645S (November 29, 1994) (1994 W.L. 711188) (*Mulcahy, J.*); *Cherry* v. *ABF Freight Systems, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV930354865S (June 29, 1994) (12 Conn. L. Rptr. 101) (*Hartmere, J.*); *Shabazz* v. *Price*, Superior Court, judicial district of New Haven, Docket No. CV930353763 (April 22, 1994) (11 Conn. L. Rptr. 331) (*Hodgson, J.*); *Paradiso* v. *Nasinka*, Superior Court, judicial district of Waterbury, Docket No. 0112154 (February 8, 1994) (11 Conn. L. Rptr. 53) (*W. Sullivan, J.*); *Condron* v. *Pollak*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV920128731S (November 18, 1993) (10 Conn. L. Rptr. 411) (*Dean, J.*); *Sliney* v. *Denisanko*, Superior Court, judicial district of New Haven, Docket No. 334928 (August 6, 1993) (9 Conn. L. Rptr. 537) (*Gordon, J.*); *Beckwith* v. *Akus*, Superior Court, judicial district of New London, Docket No. 524967 (March 15, 1993) (8 Conn. L. Rptr. 487) (*Hurley, J.*); *Henderson* v. *Micciche*, Superior Court, judicial district of Waterbury, Docket No. 0105625 (May 1, 1992) (6 Conn. L. Rptr. 317) (*Murray, J.*); *Kizina* v. *Minier*, Superior Court, judicial district of Waterbury, Docket No. 0993755 (January 24, 1992) (5 Conn. L. Rptr. 481) (*Santos, J.*).

to us." *Hay* v. *Medical Center Hospital of Vermont,* supra, 145 Vt. 545. "Our oath is to do justice, not to perpetuate error." (Internal quotation marks omitted.) *Theama* v. *Kenosha,* supra, 117 Wis. 2d 519. In my view, in light of the uniqueness of the parent-child relationship and our recognition of children's legal rights, the analysis of those courts that have adopted the loss of parental consortium cause of action is more persuasive than the analysis of those courts that have rejected it.[13]

## III

The majority concludes that public policy does not support recognition of this cause of action because the costs of recognizing it—namely, (1) increased insurance premiums, (2) increased litigation expenses, and (3) double recovery of damages by the child—outweigh the benefits of recognizing it. I cannot accept these reasons because they are based on conjecture and irrelevant concerns.

The majority provides nothing more than conjecture to support its argument that adoption of a cause of

___

[13] Indeed, some of those jurisdictions reject the loss of parental consortium cause of action on the basis that the issue should be addressed by the legislature. *Koskela* v. *Martin,* 91 Ill. App. 3d 568, 571, 414 N.E.2d 1148 (1981); *Norwest* v. *Presbyterian Intercommunity Hospital,* 52 Or. App. 853, 856–60, 631 P.2d 1377 (1981), aff'd, 293 Or. 543, 652 P.2d 318 (1982). Clearly, because the cause of action for loss of consortium was initially created and developed by courts, it is the court's responsibility to make changes in the common law "if [it] no longer fits the realities of the present day." *Shockley* v. *Prier,* 66 Wis. 2d 394, 397, 225 N.W.2d 2d 495 (1975).

Other jurisdictions deny recovery for loss of parental consortium based on the misguided belief that damages are too uncertain and the child's injury is of a noncompensatory nature. See, e.g., *Hoesing* v. *Sears, Roebuck & Co.,* 484 F. Sup. 478, 480 (D. Neb. 1980); *Borer* v. *American Airlines, Inc.,* 19 Cal. 3d 441, 449, 563 P.2d 858, 138 Cal. Rptr. 302 (1977). This argument lacks merit because juries in our state are able to assess the appropriate award in cases in which damages, such as recovery of pain and suffering, are just as intangible as those of the loss of a parent's consortium. Furthermore, even though money is "a poor substitute for the loss of a parent's society and companionship, it is the only workable way that our legal system has

action for loss of parental consortium " 'will impose an added economic burden upon society.' " There is no evidence in the record that certain costs will arise if we recognize this cause of action; nor do the parties offer any evidence that certain costs definitely will be imposed on society if we recognize it. Furthermore, it is not as if we would be imposing an economic obligation on an innocent person free from any wrongdoing. On the contrary, the person or entity required to respond to the payment of damages is a wrongdoer— either as the result of a negligent or intentional act.

Moreover, the majority's concern over the " 'significant increases in insurance premiums' " that allegedly will result if we adopt this cause of action is misplaced. Insurance practices must adapt themselves to the law, and not the law to insurance practices. *Norwest* v. *Presbyterian Intercommunity Hospital*, 293 Or. 543, 552, 652 P.2d 318 (1982) ("[a] person's liability in our law still remains the same whether or not he has liability insurance; properly, the provision and cost of such insurance varies with potential liability under the law, not the law with the cost of insurance"); *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wash. 2d 131, 140, 691 P.2d 190 (1984) ("[w]hen considering the recognition of a new cause of action, the specter of increased insurance rates is one of our least concerns"). The need to compensate children for their loss—indeed to cover the expenses arising out of psychological injuries the child experiences because of a loss of the society and companionship of the parent—*outweighs* any increase in the costs of insurance.[14] Since the majority speculates, I will likewise do so. I suspect that, as in the case

found to ease the party's tragic loss." *Theama* v. *Kenosha*, supra, 117 Wis. 2d 523.

[14] "[W]e believe that any burden to society is offset by the benefit to the child, who through compensation may be able to adjust to his or her loss with stability. Ultimately, society will benefit as well, since ideally the child will become a normal adult who is capable of functioning as such in his or

of the adoption of a cause of action for loss of spousal consortium, the adoption of a cause of action for loss of parental consortium will have no significant or measurable impact on the cost of insurance.

I also disagree with the majority's concern over increased litigation expenses. Even "if recognition of this cause of action causes more injured parties to seek redress in the courts, this does not argue against such recognition. It is the duty of the courts to redress injuries, and it is expected that injured parties should look to the courts for assistance." *Kizina* v. *Minier*, Superior Court, judicial district of Waterbury, Docket No. 099375 (January 24, 1992) (5 Conn. L. Rptr. 481), citing *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 533. Because the action for loss of parental consortium is derivative, the claims of the children, as in the present case, would be joined in one action at trial. Thus, no additional burden would be placed on our trial courts and insignificant increases in litigation costs would occur. Even if the children's action were brought separately, they certainly would be joined for trial purposes. *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494. "Moreover, because a consortium action is derivative of the injured spouse's cause of action, the consortium claim would be barred when the suit brought by the injured spouse has been terminated by settlement or by an adverse judgment on the merits." Id.

The majority also argues that recognition of this cause of action would create a significant risk of double recovery by the child—that is, damages awarded the parent and child would overlap. This precise argument was addressed and rejected in *Hopson*. By trying the underlying parent tort cases with that of the child's

her own social setting." *Theama* v. *Kenosha*, supra, 117 Wis. 2d 525; *Berger* v. *Weber*, 411 Mich. 1, 3, 303 N.W.2d 424 (1981); *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 545.

claim for loss of consortium, "the danger of improper verdicts will be minimized. For example, while a claim for loss of consortium could include as elements of damages loss of companionship, society, affection . . . and moral support, the recovery in a particular case could be limited to the elements established in that case by means of instructions from the court describing to the jury those damages which are recoverable and those which are not." Id.

Furthermore, by making this argument, the majority assumes that juries cannot distinguish between a child's claim for emotional damages and a parent's claim for pecuniary damages relating to support for the child. This assumption is contrary to the general practice of asking jurors to make fine distinctions in damage awards. I am confident that jurors who presently are asked to distinguish between the claims for damages of each spouse in a loss of spousal consortium action can do the same in a loss of parental consortium action. See W. Prosser, supra, § 125, pp. 896–97 ("[t]he obstacles in the way of satisfactory limitation of recovery [that is, preventing the double compensation of the child] are no greater than in the case of the [spouse]").

Finally, this alleged problem "may be easily cured by limiting the injured parent's recovery to the child's loss of the parent's pecuniary ability to support the child" and limiting the child's cause of action to the economic and noneconomic damages that arise from "the loss of the parent's society and companionship." *Theama* v. *Kenosha*, supra, 117 Wis. 2d 526; see, e.g., *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, supra, 734 P.2d 995–96; *Villareal* v. *Dept. of Transportation*, supra, 160 Ariz. 480; *Williams* v. *Hook*, supra, 804 P.2d 1136–37; *Hay* v. *Medical Center Hospital of Vermont*, supra, 145 Vt. 541; *Belcher* v. *Goins*, supra, 184 W. Va. 403.

Notwithstanding its irrational economic fears, the majority cannot and does not deny the fact that development of "a child's character, disposition, and abilities [has] a corresponding impact on society . . . ." *Salin* v. *Kloempken*, supra, 322 N.W.2d 737. Indeed, one of the reasons our municipalities spend large portions of their tax revenues on public education is to ensure that children will develop socially and intellectually in order to have a positive impact on society. Nor can the majority deny that "[b]enefits of the greatest value flow to a child from parental love, society, care and services"; id.; and that the loss of these benefits "can severely impact a child's development and have a major influence on a child's welfare and personality throughout life."[15] *Villareal* v. *Dept. of Transportation*, supra, 160 Ariz. 478; W. Prosser, supra, § 125, p. 896 (children who lose these benefits suffer "a genuine injury and a serious one").

Despite these obvious facts, and the majority's own admission that the recovery of damages will provide some children with "the wherewithal to heal [their] wounds, thereby helping [them] and society at large," the majority incredibly concludes that the benefits of allowing children to recover damages for their injuries are too uncertain to warrant adoption of this cause of action. Clearly, damages awarded a child "might enable the family to obtain live-in help that could provide not only domestic services, but, incidentally, a measure of guidance and companionship. The child who has suffered an emotional maladjustment as a result of his deprivation would have funds available to pay for

[15] One law review commentary notes that "[i]n studies of families in which one of the parents was chronically or physically ill, the children had higher rates of illnesses themselves. Higher incidences of juvenile delinquency and psychiatric disorders were also evident.' Comment, 'The Child's Cause of Action for Loss of Consortium,' 5 San Fern. V. L. Rev. 449, 461 (1977) . . . ." (Internal quotation marks omitted.) *Theama* v. *Kenosha*, supra, 117 Wis. 2d 515.

needed psychiatric treatment. It is not unrealistic to assume that in many cases monetary compensation could make the difference between a child who suffers a permanent handicap due to the loss of a parent's love and guidance and a child who is able to make a reasonable adjustment to his loss." (Internal quotation marks omitted.) *Theama* v. *Kenosha,* supra, 117 Wis. 2d 523–24.

Even if the majority were correct that the adoption of this cause of action, as defined by the plaintiff, would place an economic burden on society, we can circumscribe the action to lessen its burden, as we did in *Clohessy,* and thereby prevent its costs from exceeding its benefits. "[C]ourts throughout the country have imposed various limitations on a loss of [parental] consortium claim that might be appropriate. Thus the action [can be] limited to the time of the child's minority. *Shockley* v. *Prier,* [66 Wis. 2d 394, 401, 225 N.W.2d 495 (1975)]; the jury can be told to consider the actual relationship between child and parent to determine whether it was a loving one, id., also see *Dymek* v. *Nyquist,* [128 Ill. App. 3d 859, 868, 469 N.E.2d 659 (1984)]; courts have also required that the child be severely incapacitated before the action is allowed. *Reben* v. *Ely,* [146 Ariz. 309, 314, 705 P.2d 1360 (1985)]; *Yordon* v. *Savage,* 279 So. 2d 844, 845 (Fla. 1973); *Shockley* v. *Prier,* supra [401]." *Falconieri* v. *Choquette,* Superior Court, judicial district of New Haven, Docket No. CV960383034S (September 26, 1996) (17 Conn. L. Rptr. 658, 660).

IV

The majority concludes that there is no reasoned or principled justification for this court to adopt a cause of action that is "arbitrarily" limited, "[i]n the constellation of family relationships," to children and parents.

First, we did precisely that in *Clohessy*.[16] Furthermore, the majority's concern for arbitrariness "ignores the importance of the *nuclear* family in present-day society, as well as the factor of foreseeability. This court [should have] no difficulty in limiting such a cause of action to the two relationships likely to be most severely affected by a negligent injury to a parent, namely, the husband-wife relationship, and that of the parent and minor child." (Emphasis in original.) *Theama* v. *Kenosha*, supra, 117 Wis. 2d 524. " 'The distinction between the interests of children and those of other relatives is rational and easily applied. Most children are dependent on their parents for emotional sustenance. This is rarely the case with more remote relatives.[17] Thus, by limiting the plaintiffs in the consortium action to the victim's children, the courts would ensure that the losses compensated would be both real and severe.' " Id., 524–25, quoting note, supra, 56 B.U. L. Rev. 738.

Finally, when determining whether our public policy should recognize a duty for loss of parental consortium, we must view the practical aspects of this injury. I posit this situation. Should not the drunken driver who causes serious injury to the parent of a child of tender

---

[16] In *Clohessy* v. *Bachelor*, supra, 237 Conn. 56, "we conclude[d] that a bystander may recover damages for emotional distress under the rule of reasonable foreseeability if the bystander satisfies the following conditions: (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response."

[17] "[I]t is foreseeable that a child will be severely emotionally impaired by a serious injury to the parent, whereas it is not usually expected that a relative or friend will experience such an impairment." *Theama* v. *Kenosha*, supra, 117 Wis. 2d 525 n.16.

years, which results in such severe psychological injuries that psychiatric treatment is required for the child, pay for the child's treatment and compensate the child for all of his or her consequential damages?

Because the recognition of the cause of action for loss of parental consortium: (1) is logically consistent with our prior holdings in *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 485, and *Clohessy* v. *Bachelor*, supra, 237 Conn. 31; (2) is consistent with our legislature's and this court's acknowledgment that a child's interest in the love, affection, care and guidance of his or her parent must be protected; (3) would create important direct benefits for the child, and indirect benefits for society; and (4) would not require arbitrary limitations; this court should adopt it. Dean Pound recognized as early as 1916 that even though, "[a]s against the world at large a child has an interest . . . in the society and affection of the parent . . . the law has done little to secure these interests." R. Pound, "Individual Interests in the Domestic Relations," 14 Mich. L. Rev. 177, 185 (1916). Nevertheless, today, the majority concludes, for public policy reasons, that this court should not do anything to protect a child's interests in the most important relationship in our society—that of the parent and child.

Accordingly, I dissent.