[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO STRIKE
The defendants Travelers Insurance Company of Illinois (Travelers) and Gulf Insurance Company (Gulf) have filed a motion to strike directed against the amended complaint which was brought under the so-called direct action statute, § 38a-321 of the General Statutes.
The first count against Travelers alleges that the plaintiffs purchased a home from the Woodwards. In the sale of the home, Buffum Rossin Realty, Inc. (Buffum) acted as realtors for the Woodwards and a Walter Geswell, Jr. acted as an agent in the employ of the realty company. At the time of the sale, the realty company and its agent were insured by the defendant Travelers.
On March 30, 1999, the plaintiffs sued the Woodwards, the realty company and its agent claiming among other things that there were negligent misrepresentations made to them concerning the house involving lead paint contamination. The final amended complaint of this suit is attached to the complaint as Exhibit A.
On or about March 18, 1999, the Travelers denied coverage to their insureds, Buffum and Mr. Geswell. On February 1, 2001, the plaintiffs obtained a judgment against the insureds in the amount of $78,780 pursuant to a stipulated agreement. A copy of this document is attached to the complaint as Exhibit B.
In paragraph 9 of the complaint now before the court, the plaintiffs note the defendant refused to pay the damage award of $78,780 and: "By refusing to defend said claim and pay said damages the Travelers breached the contract of insurance with the insureds and the plaintiffs are subrogated to all the rights of the Insureds pursuant to said contract in accordance with C.G.S. § 38a-321."
The second count lies against Gulf and repeats the allegations of the first count.
It should also be noted that, without formally marking it as an exhibit, the plaintiffs have attached to the amended complaint which is the subject of this motion, a copy of the insurance contract which is a predicate to this litigation.
In their briefs, the defendants refer to the terms of the policy and CT Page 7813 the plaintiffs characterize it at one point in a way that could not be garnered by merely reading the language of the complaint.
The rules to be applied under a motion to strike are that every reasonable inference is to be given to a complaint when deciding whether it is legally sufficient. Amodio v. Cunningham, 182 Conn. 80 (1980). Also, "a motion to strike cannot be opposed by facts outside the attacked pleading." Connecticut Practice Series, Vol. 1, Horton Knox, p. 366, citing State v. Bashura, 37 Conn. Sup. 745, 748; and Kilbride v. DushkinPublishing Group, Inc., 186 Conn. 718, 719 (1982). On the other hand, documents or exhibits can be made "part of the complaint," see Practice Book § 10-29 for purposes of a motion to strike analysis at least where the defendants, as here, admit they are operative documents for purposes of setting forth the plaintiffs claim and their attack on that claim through the vehicle of a motion to strike, cf. Streicher v. Resch,20 Conn. App. 714, 716 (1990), (not directly on point but suggestive that foregoing observation is valid).
 1.
The defendants first argue our direct action statute (§ 38a-321) does not permit this action because of the nature and effect of the particular stipulation in this case and also because the insurer does not concede there is coverage or a duty to defend.
The direct action statute in relevant part reads as follows:
"General Statutes § 38a-321, Liability of insurer under liability policy. Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or cooperation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. . . . Upon the recovery of a final judgment against any person, firm or corporation by any person including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied CT Page 7814 within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment."
The statute was reviewed in Black v. Goodwin, Loomis Britton, Inc.,239 Conn. 144 (1996). In that case, the plaintiff administrator of an estate brought suit against a company called White, Wheeler Co. (White) for the wrongful death of Mr. Black. The Maryland Casualty Company, White's insurer, denied `coverage and refused to defend in that action. The plaintiff and White, however, settled by entering into a stipulation. Under the terms of the settlement White assigned any claims it had against its insurer to the plaintiff and based on the assignment the plaintiff brought suit against Maryland Casualty.
The court held that the stipulated judgment was enforceable by the plaintiff against the insurer. The court reasoned that when an insurer breaches its duty to defend it has to bear the consequences of that decision including any reasonable settlement agreed to in good faith, that is without fraud or collusion, by the plaintiff and the insured.
The court rejected the notion that the possibilities of fraud or collusion were so great in such a scenario that a direct action should not be allowed. The court reasoned that "the appropriate method by which to address this possibility is not to assume such impropriety, but rather, to permit the insurer to contest the stipulated judgment on the ground that it was improperly obtained — i.e., as a result of fraud and collusion, id. 154-155.
 (a)
In this case, the defendants seek to distinguish Black and its applicability by first arguing that "where before judgment enters on a stipulated judgment the plaintiff covenants not to execute the stipulated judgment against the insured, the insured is effectively released from liability to the plaintiff and in turn the insured has no viable statutory or contractual claim against the insurer." Thus, the right to bring a direct action against the insurer under § 38a-311 is eliminated (pp. 17-18 of brief).
The court rejected what the defendants concede was a similar argument in Black where it said:
CT Page 7815 "Maryland Casualty further claims that White's assignment of rights in favor of the plaintiff was not effective because plaintiff had released White from liability and, accordingly, White had incurred no payment obligation requiring indemnification. In other words, Maryland Casualty claims if there is no obligation of White . . . under the judgment, there is no obligation to indemnify White . . . from it. This claim is without merit," id. p. 155.
The court went on to note that Maryland Casualty's argument was premised on the notion that the contract of insurance was one of indemnity and not one of general liability," id. p. 156. The policy in this case is clearly a liability not an indemnity policy, see title and § VII where "claim" is defined as "a demand received by an insured for money or services" and "damages" is defined as "compensatory damages which an insured becomes legally obligated to pay" and § I which states the company "will pay on behalf of an insured `damages' for which `claim' is made during the `policy' period." Perhaps even more to the point at239 Conn. p. 156, footnote 13, the court said:
 "We also note that the plaintiffs claim under § 38-321 does not depend on the assignment of rights under the stipulation because, under that statutory provision, the insurer is liable whether its contract is one of liability or indemnity."
Companies can use whatever language they want in their policies but: "In accord with general principles governing the incorporation of statutory terms into the contract of insurance, a provision of the statute authorizing a direct action must be read into, and form part of every contract to which it is applicable whether the contract is oral or written and whether the policy be considered as an indemnity policy or a liability policy," Couch on Insurance 3d, Vol. 7, § 104:24, p. 104-43.
 (b)
The defendants are aware of the fact that the just discussed argument they make was rejected in Black and they also realize that their concerns about the possibilities of fraud and collusion at least under the Black
state of facts was held not to bar a direct action. But the central point they make is that the facts in this case are distinguishable from Black
because in that case, unlike the case now before the court, the insurer conceded there had been a right to coverage and a duty to defend at the time of appeal, see Black at 237 Conn. p. 147, footnote 5. In their CT Page 7816 brief, these defendants argue "as with its decision on Maryland Casualty's public policy argument (i.e. danger of fraud and collusion), the Black court explicitly noted that its decision was influenced by the fact that Maryland Casualty had wrongfully denied coverage, thereby precluding the company from attempting to `hide behind' the policy's language to avoid its indemnity provisions. As discussed above (in their brief), there has been no determination of wrongful denial in the instant case. . . ."
The basic problem with the defendants' position is that the coverage question is a separate question both analytically and as a policy issue from the separate consideration of whether abstractly speaking §38a-321 actions should be allowed where there has been a stipulation by an insured assigning the claim against it to the plaintiff claimants who can then proceed under the statute against the insurer.
In other words, it is a truism guaranteed by the insurer's right to due process that: "The claimant, in a direct action (against the insurer) has no superior right to compensation such that recovery should be allowed for a loss which is not caused by a risk which the insurer and insured agreed to have covered by the policy. In essence, the coverage of a policy is not altered by the fact that direct action may be brought thereon, and the mere fact that a statute authorizes the injured person to bring a direct action does not permit recovery where the accident or injury is not within the coverage of the policy," Couch on Insurance 3d, Vol. 7, § 106.10, p. 106-21, cf. Dickenson v. Maryland Casualty Co.,101 Conn. 369, 377 (1924). This is a universally accepted proposition, see Insurance Law and Practice, Appleman, Rev. Vol. 7C, § 4690, p. 235, where it says:
 "Although the insured can make such settlements as his (sic) interests require, such a settlement is not conclusive upon the insurer which still has a right to be heard on the question of policy coverage or the possibility of fraud."
cf. Butters v. City of Independence, 513 S.W.2d 418, 426 (Mo., 1974);United Services Automobile Association v. Morris, 741 P.2d 246, 253
(Aug., 1987).
What all of this leads to is a conclusion that says even if the insurer does not concede it has a duty to provide coverage and in fact has decided not to defend that does not mean that where the plaintiff claimant and the insured have settled and entered into a stipulation like the one before the court no direct action against the insurer will be allowed per Black under the direct action statute (§ 38-321). It just CT Page 7817 means that the issue of coverage will be litigated in the direct action suit just as the insurer has a right to raise the issue of fraud and collusion and the reasonableness of the settlement.
Any other conclusion would provide insurers an easy mechanism to avoidBlack's approval of stipulations between insureds and claimants as a predicate to direct actions under § 38a-121. All insurers would do is deny coverage and an obligation to defend and then argue Black does not apply. or to put it another way, what are insureds to do in such situations? Will they be forced first to bring a declaratory judgment action to determine the ambit of coverage while moving at the same time to stay the primary action brought against them? Judicial economy, if nothing else, would appear to dictate the result the court reaches here.
In fact, in the Black decision itself, where the court adopted the "majority view" that stipulated judgments can form the basis of a so-called direct action against the insurer, cases were relied on by our court wherein the coverage issue was litigated in the direct action.Metcalf v. Hartford Accident Indemnity Co., 126 N.W.2d 471, 474,475-476 (Neb., 1964); Red Giant Oil Co. v. Lawlor, 528 N.W.2d 524, 531
(Iowa, 1995), cf. Greer v. Northwestern Nat. Ins. Co., 743 P.2d 1244
(Wash., 1987), cited at 239 Conn. p. 154. Also see comment in 44 Am.Jur.2d "Insurance," § 1448, p. 397, where it notes that "Provisions giving the injured person the right to sue the insurer[1]
do not enlarge the insurer's liability but merely enable the injured person to succeed to the insured's rights against the insurer, with the consequence that defenses good against the insured are good against the injured person. . . . Defenses based upon the coverage of voluntary liability insurance are generally available to the insurer against the injured person" (see numerous cases cited at footnote 12 to article supporting latter assertion, pp. 397-398).[2]
 2.
The other basis for the motion to strike is the defendants' assertion that our "direct action statute does not authorize (such suits) based on claims for purely economic loss." Section 38a-32 1 permits direct actions against insurers for policies insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to theproperty of any person, for which loss or damage such person, firm or corporation is legally responsible. . . ." In this case, the insureds agreed to have judgment enter against them on the negligence claim (third count of action against insured). This third count only alleges the plaintiffs detrimentally relied on Buffum's representations that the Woodward house contained no lead paint and as a result of the negligent false representation the plaintiff buyers "have sustained pecuniary loss CT Page 7818 and damage."
The defendants do cite Verdon v. Transamerican Co., 187 Conn. 363
(1982), which interpreted the predecessor statute to § 38a-321, § 38-175. The defendants concede that in Verdon "damage to property . . . was not limited to physical damage to tangible property and could include Verdon's malpractice claim against an attorney for diminution in the value of an estate the attorney handled." This is clearly a claim for "economic loss" or harm, not "physical damage to tangible property" and if Verdon is still good law, this trial court clearly cannot grant the motion to strike on the basis now advanced by the defendants.
The defendants argue Verdon is not controlling. They take the position that the court "based its decision, in part, on analogy to Connecticut's Product Liability Act" which at the time Verdon was decided permitted economic harm claims. They point to the fact that the legislature subsequently amended the Product Liability Act which in effect provided that claims for purely economic harm were excluded from the definition of "damage to property." They also point to several decisions that although not interpreting the direct action statute or explicitly overruling Verdon in effect "serve to limit the term `damage to property' in Connecticut's direct action statute." The cases cited are Williams Ford,Inc., et al v. Hartford Courant Co., 232 Conn. 559 (1995), Mendillo, etal v. Bd. of Education, 246 Conn. 456 (1998), and Waters for Autuori, etal, 236 Conn. 820 (1996).
In Williams v. Ford, the court interpreted the phrase "damage to property" in the comparative negligence statute and held the statutory language of § 52-572 (n) in using that phrase does not apply to purely commercial loss," id. p. 581. At p. 582-583, the court went on to say:
"We recognize that the phrase `damage to property' is susceptible to a broad interpretation and could be extended beyond its usual and ordinary connotation of physical damage to tangible property, so as to include purely commercial damage. For example, in Verdon v. Transamerica Ins. Co., 187 Conn. 363, 372-73, 446 A.2d 3
(1982), in the context of General Statutes (Rev, to 1981) § 38-175, we concluded that the phrase `damage to the property of any person' included purely commercial loss. Our reasoning in that case was based, in part, on our determination that the legislative history of another statute, General Statutes (Rev, to 1981) § 52-572m, `contain[ed] a clear indication that the phrase `damage to property' CT Page 7819 in [its] definition was intended to encompass economic harm'; id., 372; and that the policy reasons for including economic harm within the definition under the product liability statute applied equally to the direct action statute. Subsequent to our decision in Verdon, however, the legislature amended § 52-572m
(d) in 1984, specifically to exclude purely commercial loss from the definition of `harm.' Public Acts 1984, No. 84-509, § 1. We infer, therefore, that the legislature was mindful of a distinction between property damage and commercial losses when it amended the comparative negligence statute in 1987. Public Acts 1987, No. 87-227, § 3."
As indicated, at the time Verdon was decided, the legislature had not yet acted to limit the ambit of "damage to property" claims under the products liability act so as to exclude claims for economic harm. In fact, to the Verdon court the legislative history of the products liability act as it existed in 1982 allowed for a more expansive reading of the phrase so as to include economic harm claims. Relying in part on this interpretation of that act, the Verdon court held the legislature, when it passed § 38a-715, intended that the direct action statute permitted a recovery for economic harm or commercial loss. The fact that several years later the legislature amended the products liability act to restrict the meaning of "damage to property has no bearing on what the legislature intended by that phrase when it passed § 38-715. TheVerdon court's reference to the products liability act in 1982 was only a reference tool of statutory interpretation for a similar phrase in § 38-715 used by the court to ascertain the legislature's intention as to the latter statute at the time that statute was passed.
Interestingly, in the last sentence of the quotation from WilliamsFord, just referenced in this opinion the court said it inferred the legislature was aware of the destruction between "property damage" and "commercial loss" when it amended the comparative negligence statute in 1987 — after all in 1984 it amended the products liability act to preclude purely economic or commercial loss from the definition of harm. Well, the legislature must be held to be aware of Supreme Court decisions, specifically Verdon, and when it amended the products liability act in 1984 it did not see fit to amend § 38-715.
Furthermore, the Verdon court reached its interpretation not merely based on an argument by way of analogy to the products liability act as it existed in 1982. It gave a broad interpretation to "damage to property" based on broad consideration of public policy — it said at187 Conn. p. 370: "Nor can we ascertain any consideration of public CT Page 7820 policy which would justify authorization of a direct action by a judgment creditor against his debtor's insurer in cases where the property damaged is tangible but not where the property involved is intangible."
This court also believes that trial and appellate courts should be reluctant to refuse to follow or reverse prior opinions which would have the effect of expanding or constricting coverage obligations of insurers. Based on reliance upon prior legal precedent risks have been calculated, premiums set, policy conditions changed. Given these factors reversal of the legal basis of such market place decisions could have the unintended effect of creating windfalls for insurers or unfairly penalizing them. Just like statutes, court decisions interpreting statutes, in effect, become provisions and conditions of policies and barring some overriding constitutional problem court decisions are best changed by legislative action when they involve coverage questions.
In any event, for the foregoing reasons, the motion to strike is denied.[3]
Corradino, J.